GILBERT ENGINEERING COMPANY v. CITY OF ASHEVILLE, NORTH CAROLINA, A MUNICIPAL CORPORATION, AND O'BRIEN & GERE, INC., A CORPORATION

No. 8428SC547

(Filed 7 May 1985)

1. **Contracts § 21.2— construction contract—responsibility for defects in plans or specifications**

   A construction contractor who has followed plans and specifications furnished by the owner or his architect or engineer will not be responsible for consequences of defects in those plans or specifications. Absent an agreement to the contrary, there is an implied warranty by the owner that the plans and specifications are suitable for the particular purpose and that if they are complied with the completed work will be adequate to accomplish the intended purpose.

2. **Contracts § 21.2— implied warranty of suitability of plans and specifications— burden of proving breach**

   In order to establish a breach of an implied warranty of suitability of plans and specifications, the contractor has the burden of proving that the plans and specifications were adhered to, that they were defective, and that the defects were the proximate cause of the deficiency in the completed work.

3. **Contracts § 21.2; Professions and Occupations § 1— breach of warranty of suitability of plans and specifications—absence of ultimate findings and conclusion**

   The trial court erred in failing to make ultimate findings and a conclusion of law as to whether defendant city breached an implied warranty of suitability of the plans and specifications for a key wall between the filter building and filter beds of a water and sewer treatment facility constructed by plaintiff for defendants. The trial court's findings that the design work was done in accordance with accepted standards and that neither the designer nor defendant city

was negligent in designing the facility were insufficient to resolve the issue of implied warranty.

**4. Contracts § 21.2— breach of warranty of suitability of plans and specifications—damages**

If, upon remand, the trial court should determine that an implied warranty of suitability of the plans and specifications of a key wall constructed by plaintiff existed and that defendant city breached such warranty, resulting in leakage in the wall, plaintiff would be entitled to recover damages for its work performed to correct the leaks without complying with contract requirements for payment for extra work. However, should the trial court find that the leakage did not result from any deficiency in the plans and specifications and that the waterproofing was required by plaintiff's obligations under the contract to construct a watertight wall, plaintiff's failure to comply with provisions of the contract pertaining to compensation for extra work would bar its recovery for additional expenses incurred in waterproofing the key wall.

**5. Contracts § 21.2— delay in completion of project—acts of contractor rather than unsuitable plans—no recovery of withheld liquidated damages and overhead expenses**

Where the trial court made findings supported by competent evidence that the delay in completion of a waste treatment facility resulted from acts and omissions of plaintiff contractor rather than from defendant city's breach of an implied warranty of suitability of the plans and specifications for a key wall, plaintiff was not entitled to recover liquidated damages and engineering fees withheld by defendant or plaintiff's extended overhead expenses.

APPEALS by plaintiff and defendant O'Brien & Gere, Inc., from *Allen, C. Walter, Judge.* Judgment entered 24 March 1983 in Superior Court, BUNCOMBE County. Heard in the Court of Appeals 16 January 1985.

Plaintiff Gilbert Engineering Company (hereinafter referred to as "Gilbert") is a North Carolina corporation engaged in business as a heavy construction contractor, particularly in construction of water and waste treatment facilities. On 17 June 1975 defendant City of Asheville (hereinafter referred to as "City") received bids for the construction of improvements to its water filtration and distribution facilities. The project, known as "Water Facilities, Phase II," had been designed by defendant O'Brien & Gere, Inc. (hereinafter referred to as "O'Brien & Gere"), a North Carolina corporation specializing in engineering and design of water and sewage treatment facilities. Under its contract with City, O'Brien & Gere was also responsible for supervision of construction of the project. Gilbert submitted a low bid of $5,177,398.00 and was awarded the contract on 26 June 1975. The

contract required that the project be completed within 600 days after Gilbert was given a notice to proceed with the work, and provided for liquidated damages in the amount of $200.00 per day for each calendar day the work was not completed beyond that time. The contract further provided that if the work was not completed within the time provided, additional engineering and inspection fees incurred by City from the specified time of completion to the time the project was actually completed would be charged to Gilbert and deducted by City from the final payment. Gilbert was directed to proceed with the work on 11 August 1975; completion was required by 3 April 1977. During the course of construction, five extensions of time, aggregating 98 days, were granted which extended the date for completion to 10 July 1977.

Generally, the project called for construction of several structures including a filter plant and filter beds, a pumping station, a clear well tank and back wash tank, as well as flow monitoring stations throughout Buncombe County, piping, equipment, instrumentation, landscaping and paving. The major issue in this litigation arises out of the construction of the filter plant, which consists essentially of two components: (1) the filter beds and (2) the main filter building. These two components are joined by a common wall, referred to as the "key wall," which is approximately 102 feet in length, 28 feet high and 1 and ½ feet thick. The filter beds are four rectangular concrete tanks into which raw water is piped, and is filtered by passing downward through several different types of filtering materials in order to remove impurities. Adjacent to these filter beds, separated by the key wall, is the main filter building. The key wall, interior and exterior walls of the filter beds, and the floors of the filter bed and filter building are constructed of poured concrete, reinforced with steel.

A number of pipes pass through sleeves in the key wall between the filter beds and the filter building in order to permit the flow of raw water into, and filtered water out of, the filter beds. The key wall between the filter beds and the filter building was required, by its nature, to be watertight. The contract between Gilbert and City provided, inter alia:

MP-250.01.  GENERAL. All structures required to be water-tight and all pressure and gravity piping and pipe lines shall be tested by the Contractor as directed by the Engineer. All tests shall be conducted in a manner to minimize interference with the progress of the work.

The Contractor shall notify the Engineer when the work is ready for testing and tests shall be conducted as soon as possible thereafter under the direction of the Engineer. Personnel for reading meters, gauges or other measuring devices will be furnished by the Engineer. All other labor, equipment, water and materials, including meters and gauges shall be furnished by the Contractor at his own expense.

MP-250.02.  TESTS OF STRUCTURES. Tanks, vaults, wells, and other fluid containing structures shall be tested before back-filling by filling the structure with water to overflowing, or other level as directed by the Engineer, and observing the water surface level twenty-four hours thereafter. Exterior surfaces shall be examined for leakage, especially at construction joints. Leakage will be considered to be within the allowable limits for structures when there is no visible sign of leakage and where the water surface does not drop more than ½ inch during the twenty-four hours leakage test. A slight dampness in the exterior wall surface during the test period will not be considered as leakage, except in the case of pre-stressed concrete structures. All wall castings, sleeves, and other openings shall be plugged temporarily during the test period.

If the leakage exceeds the allowable limit, the work shall be repaired by removing and replacing the defective portions, waterproofing the inside or outside or by other methods as approved by Engineer.

In designing the project, O'Brien & Gere caused an investigation of subsurface soil conditions to be made. The results indicated that the "footings for the filter plant will be placed on stiff to very stiff residual soil." These results were furnished to Glenn A. Eason, a professional engineer employed by O'Brien & Gere to design the key wall and its foundation. Eason's design was incorporated into O'Brien & Gere's plans and specifications.

In February, 1976 Gilbert began excavating for the foundation of the key wall. In the course of excavation, Gilbert discovered that approximately one-third of the total length of the key wall would be founded on rock; the remaining two-thirds of the length of the wall would be founded on soil. This condition was made known to O'Brien & Gere, which instructed Gilbert to proceed according to the original plans and specifications, except for the instruction to pour lean Class D concrete to bring over excavated portions of the foundation up to subgrade.

Gilbert proceeded with construction of the key wall and on or about 10 May 1977 conducted the initial leakage test on the key wall. When the filter beds were filled with water, leakage was observed at various places in the key wall as well as from and around the sleeves through which the pipes passed. Waterproofing efforts were undertaken by Gilbert and by a subcontractor, Western Waterproofing Company. These repairs continued periodically until 11 June 1978.

Through periodic payment requests, Gilbert estimated its progress in completion of the project. During the period of time when the leaks in the key wall were first discovered, other aspects of the project, which were not associated with the filter building and key wall, were substantially incomplete. As of 30 April 1977, according to Gilbert's estimates, 73% of the total project had been completed. By 31 July 1977, after the extended completion date had passed, Gilbert estimated that the project was 85% complete.

On 1 December 1977 Gilbert notified O'Brien & Gere of its contention that the leaks in the key wall had been caused by differential settlement of the wall due to its being founded partially on rock and partially on soil, and requested additional compensation of $36,960.56 and an extension of contract time of 92 calendar days for repair of the leaks. The request was denied. On 28 June 1978, before the project had been finally accepted, Gilbert filed a claim with O'Brien & Gere for additional compensation and extension of contract time which included, among other items, a request for additional compensation of $100,703.32 and additional contract time of 187 days for repairs to the key wall. The total extension of contract construction time requested was 486 calendar

days, and the total extra compensation requested was $176,173.93. These requests were also denied.

The project was certified by O'Brien & Gere as being substantially completed on 19 April 1978, and final acceptance of the project by City was on 17 August 1978. When final payment was made by City, liquidated damages of $56,600.00 ($200.00 per day for 283 days from 10 July 1977 until 19 April 1978) and engineering expenses of $26,038.73 incurred by City during the 283 day period were withheld. Legal fees of $2,000.00 were also withheld, but were later paid to Gilbert by City.

On 21 February 1979 Gilbert presented a claim to City for the total amount of $128,884.33. The amount included a claim for payment of the liquidated damages and engineering fees withheld by City, $33,088.62 for extra work involved in repairing leaks in the key wall and an alternate method of caulking the sleeves and $11,156.98 for services which Gilbert asserted it had performed at the request of City, but which were not required by the contract. In addition, Gilbert made a claim for an extension of contract time of 405 days to off-set any claim by City of liquidated damages and additional engineering fees.

Gilbert then filed this suit, alleging, among other things, that City had breached an implied warranty of suitability of the plans and specifications for the key wall. The City answered, denying that Gilbert was entitled to additional compensation and asserting its right to withhold the liquidated damages and engineering fees because of plaintiff's failure to prosecute the work diligently and to complete the work within the time provided by the contract.

Approximately ten months after filing its original complaint, Gilbert filed an amended complaint joining O'Brien & Gere as a defendant. Gilbert alleged that O'Brien & Gere had been negligent in designing the key wall and its foundation. O'Brien & Gere denied negligence and pleaded the statute of limitations as a bar to plaintiff's claim. O'Brien & Gere, by amended answer, also pleaded Gilbert's Application for Final Payment, and the final payment by City, as a release of all claims except the amounts withheld as liquidated damages and engineering fees.

This case was called for trial at the 14 December 1981 Civil Session. At that time, Gilbert was permitted to amend its com-

plaint to assert an additional claim against City for extended overhead in the amount of $163,282.79. Jury trial was waived and Judge Allen heard extensive oral testimony and received in evidence a number of documentary exhibits.

Judgment was entered 25 March 1983 containing, inter alia, the following findings of fact:

14. The key wall was poured in sections, both vertically and horizontally upward from the foundation as provided by the plans and specifications. Construction joints were placed between the vertical sections as they were erected. A construction joint or water stop consisted of a thin piece of steel one-half of which is imbedded in the face of the first section poured and the other half which extrudes out of such section along its entire vertical height and then the next section is poured over and around the water stop such that one-half of the stop is in the first section and one-half is in the second section providing a barrier along the entire vertical height of the joint to prevent the passage of water through it. Steel rods or reinforcing steel were placed vertically and horizontally in the forms into which the concrete to form the walls was poured, the reinforcing rods extending outward from each section of wall into the area where the next section would be poured thereby tying together each section of the wall.

15. The openings in the wall through which the pipes passed from the filter bays into the pipe gallery necessitated the caulking around the pipes and the specifications called for it to be done through the use of hemp and poured packed lead. Because of the manner in which the pipes were placed and the distances of the flanges of the pipes from the wall, Gilbert employed a third party to apply an alternate method of caulking to prevent leakage.

16. On or about May 10, 1977, Gilbert had completed construction of the filter bays and filter building to a point where the water leakage test required under the contract section MP-250.02 could be conducted. The filter beds were filled with water and the following day Gilbert observed various leaks in hairline cracks at random places in the key wall and radiating from sleeves in the key wall and around

the sleeves. Western Waterproofing Company, a company employed by Gilbert to correct the leaks, and Gilbert began to attempt to seal the leaks in the wall. After the wall had been treated through the joint repair efforts of Western Waterproofing Company and Gilbert, the filter beds would be refilled to determine if the leaks had been stopped. This remedial work was begun on May 29, 1977, and continued up and through June 11, 1978, with leaks developing each time the bays were refilled.

17. At the time Gilbert commenced the leakage test of the filter bays, Gilbert was four (4) months behind its own revised schedule for completion of the entire project and six (6) months behind its original schedule for completion.

18. Gilbert made a claim for extra compensation and extra time to complete the contract as a result of the leaks on approximately June 28, 1978.

19. Western Waterproofing Company worked on the key wall leak repairs approximately twenty weeks of the sixty-two weeks involved in the repairs and charged Gilbert approximately $4,900.00 for the repair work it did in connection with both the key wall and the caulking of the area between the sleeves and the pipes in the key wall. The most significant leaks in the key wall were situated around the pipe sleeves and several horizontal and vertical construction joints. Random cracks and damp spots appeared in various areas of the key wall and water leaked through the key wall from the area between the pipes and sleeves which had been caulked. There were no cracks in the key wall which extended from the catwalk vertically to the base of the key wall where the rock underlying the key wall foundation merged with the stiff to very stiff residual soil.

20. Gilbert and the Engineer knew through their experience and expertise that concrete walls designed in the manner of the subject key wall could be expected to leak and that it is the nature of concrete walls to shrink as moisture created by the water in the concrete escapes resulting in the development of cracks in the concrete.

21. Differential settlement can occur when a structure is placed over two (2) different types of material with each of the materials having a different compressibility rate.

22. No cracks were evident in the catwalk nor was any settlement measured along the key wall.

. . .

26. Throughout the course of the construction project, Gilbert submitted periodic estimates for partial payments. In the four (4) requests for payment submitted by Gilbert between April 30, 1977 and July 31, 1977, Gilbert acknowledged that the installation of the chain link fencing had not begun, the seeding and mulching was only 60% complete; that the installation of the guardrail had not commenced, the curb and guttering, paved ditch concrete flume was only 30% complete; that the asphalt paving was only 11% complete; that the masonary [sic.] work ranged between 55% and 95% complete; that the tile and eppoxy [sic.] flooring ranged from being 3% to 50% complete; that the acoustical tile ranged from not having been started to being 80% complete; that the miscellaneous steel roofing and glass and glazing were only 45% complete; that the miscellaneous building specialty items ranged from being 25% to 45% complete; that the painting throughout the project ranged from being 15% to 40% complete and that such other items as site grading, site work, storm drain piping, structual [sic.] steel, roll up doors, yard piping, plant piping, plant valves, raw water pumps, high service pumps and instrumentation were not complete as of July 31, 1977. The majority of these incomplete items had no relation to or connection with and were not dependent upon the completion of the filter building and by July 31, 1977, the completion date of July 10, 1977 had already passed. On approximately September 26, 1977, the Engineer received a revised progress schedule from Gilbert indicating that all work on the project would be completed within five (5) weeks or by approximately November 1, 1977.

27. On November 17, 1977, Gilbert acknowledged its responsibility for lack of progress and the failure to have the contract completed by July 10, 1977. Some of that blame was placed on the City's request for additional work which Gil-

bert contended was not a part of the contract, contingency work and weather. Gilbert did not cite or refer to the efforts to correct the leaks in the key wall of the filter building as a cause of any delay at that time. Gilbert made its first retroactive request for an addition of time of 212 calendar days to complete the contract. This request pertained to work which had already been completed and no request for additional time had been made contemporaneously with the performance of the work as required by the contract. Gilbert, for the first time on December 1, 1977, blamed the cracks and leaks in the key wall of the filter building for the delays associated with the entire project. This claim was made by Gilbert more than four (4) months after the general contract was to have been completed with the inclusion of the 98 calendar days having previously [been] granted by the Change Orders.

28. All Change Orders dealt with various portions of the project and on occasion reflected work that had already been done by Gilbert before the Change Order was formally executed; however, Gilbert, the Engineer and the City had agreed by written memorandum or orally on all occasions on the nature of the work to be done by Gilbert and the amount of compensation and extra time it would receive and Gilbert commenced the work reflected by the Change Orders after receiving instructions from the Engineer to proceed with the work. The manner of dealing with extra work, extra compensation and additional time was governed by the contract provisions, section G-9.01, section G-3.03, section G-7.08 and G-5.04 and the terms were substantially complied with.

. . .

31. The contract between the parties provided that Gilbert's application for final payment would constitute a release of City from all claims of Gilbert except the claim for final payment. The application for final payment was made on August 17, 1978 wherein it was requested that City pay the sums withheld as liquidated damages in the amount of $56,600.00, the Engineer fees of $26,038.73 and the $2,000.00 sum withheld for legal expenses was later repaid to Gilbert.

32. The Engineer's design work was done in accordance with the accepted standards and practices of engineers working in and around Buncombe County, North Carolina.

33. Gilbert was requested by either Asheville or Gere to perform work on the site which Gilbert was not required to perform under the base contract. No Change Orders were either issued or required for this work and as requested by City or Gere, Gilbert performed the following work:

a. Gilbert repaired the leaks in two (2) existing underground pipes at a cost of $3,058.50 at the request of City;

b. Gilbert lowered underground electric cables passing beneath a roadway in order to avoid traffic damage to the line at a cost of $284.70, at the request of Engineer;

c. Gilbert painted certain portions of the buildings at a cost of $55.80, at the request of City;

d. Gilbert repaired and replaced certain pipes and valves which carried water and chemicals, at Gere's request at a cost of $7,073.00.

Based on his findings of these and other facts, the trial judge made the following conclusions:

1. The causes in this action alleged by Gilbert, Gere and the City are not barred by the contractual provisions of the contract entered into between the parties, by the statutes of limitation, or by law;

2. The Engineer and the City were not negligent by reason of the design of the water treatment facility or any part thereof, nor of the Engineer's decision not to redesign the filter building when subsurface rock was discovered in the area where the eastern foundation of the key wall was to be constructed;

3. The cause for the delay in completion of the contract by July 10, 1977 was a direct and proximate result of the acts and omissions of Gilbert;

4. Gilbert's failure to make timely requests for extensions of time or timely requests for extra compensation for

services required by the contract, prevents Gilbert from retroactively obtaining any extension of the completion date on the contract past July 10, 1977, and prevents Gilbert from recovering any amounts from the City or the Engineer for repair work associated with leaks in the key wall and with caulking the pipe sleeves and its claim for extended overhead. In this regard Gilbert failed to comply with the terms of the contract or any procedures or standards which had been adopted or established by practice by the parties outside the terms of the contract.

5. That the City was entitled to withhold from its final payment to Gilbert the sum of $56,600.00 as liquidated damages and $26,038.73 for Engineering fees;

6. Gilbert is entitled to recover of the City the sum of $3,058.50 for services rendered in repairing two (2) underground pipes which developed leaks, pipes not having been damaged by Gilbert or its sub-contractors and having been in place prior to the beginning of any construction by Gilbert;

7. Gilbert is entitled to recover from the City the sum of $55.80 for painting work done by Gilbert which was outside the scope of the contract;

8. Gilbert is entitled to recover of Gere the sum of $284.70 for relocating an electric line passing beneath the roadway, said work having been done at Gere's request.

9. Gilbert is entitled to recover of Gere the sum of $7,073.00 for reinstalling a waterline, chemical feedline, valves and paving the roadway across the work to the waterline, chemical line and valves. All work having been done upon Gere's request and not being chargable [sic.] to the City since the leaks which had developed at the junction of the lines was caused by fault in the design which was Gere's responsibility.

Gilbert was awarded a recovery against City in the amount of $3,114.30 and against O'Brien & Gere in the amount of $7,357.70. Gilbert appeals from the denial of its claims for expenses incurred in connection with the repairs to the key wall and for the payment of the liquidated damages and engineering

fees withheld by City. O'Brien & Gere appeals from judgment against it.

*Raymer, Lewis, Eisele, Patterson and Ashburn, by Douglas G. Eisele, for plaintiff appellant.*

*Bennett, Kelly and Cagle, by Harold K. Bennett, and William F. Slawter, City Attorney, for defendant appellee City of Asheville.*

*Kennedy, Covington, Lobdell and Hickman, by Wayne Huckel for defendant appellee/cross appellant, O'Brien & Gere, Inc.*

MARTIN, Judge.

## I.  GILBERT'S APPEAL

The dispositive question presented by Gilbert's appeal is whether the trial court's findings of fact and conclusions of law are sufficient to support its judgment denying Gilbert recovery against City on its claims relating to repairs to the key wall. Because the trial court failed to address an essential issue raised by the pleadings and the evidence, we conclude that the judgment is deficient and remand the case to the trial court.

In its amendment to the complaint, Gilbert alleged that City, in presenting the plans and specifications for the key wall, impliedly warranted that if Gilbert constructed the key wall as required by the plans and specifications, that it would be fit for the purposes intended, i.e., the containment of water in the filter beds. Gilbert further alleged that it constructed the key wall as required and that, nevertheless, the key wall permitted the leakage of water. Thus, Gilbert alleged, the City breached its implied warranty causing Gilbert to incur expense in repairing the leaks and delaying its completion of the project. City denied the existence of any warranty and denied the allegations of breach.

[1, 2]  The general rule is that a construction contractor who has followed plans and specifications furnished by the owner, or his architect or engineer, will not be responsible for consequences of defects in those plans or specifications. Annot., 6 A.L.R. 3d 1344 (1966). North Carolina has expressly adopted the general rule. *Bd. of Education v. Construction Corp.*, 50 N.C. App. 238, 273 S.E. 2d 504, *aff'd*, 304 N.C. 187, 282 S.E. 2d 778 (1981). The basis for the

rule is that, absent an agreement to the contrary, there is an implied warranty by the owner that the plans and specifications are suitable for the particular purpose, and that if they are complied with the completed work will be adequate to accomplish the intended purpose. *See United States v. Spearin*, 248 U.S. 132, 63 L.Ed. 166, 39 S.Ct. 59 (1918); Annot., 6 A.L.R. 3d *supra*. In order to establish a breach of such an implied warranty, the burden of proof is on the contractor to prove that the plans and specifications were adhered to, that they were defective, and that the defects were the proximate cause of the deficiency in the completed work.

The evidence presented with respect to these facts was conflicting. Gilbert's evidence tended to show that it constructed the key wall in strict compliance with the plans and specifications, but that cracks developed at construction joints and around pipe sleeves, causing leakage. Gilbert also offered evidence that due to the design of the piping, the flanges on the filter building side of the key wall were located too near the wall to permit the conventional method of caulking provided for by the plans, so that an alternative, and more expensive, method of caulking had to be employed. A structural engineer testified for Gilbert that, in his opinion, the leakage was caused by differential settlement of the key wall due to its being founded partially in rock and partially on soil, and that the design did not include provisions for differential settlement or varying subsoil conditions. Gilbert's project manager testified that had the leakage problems not been encountered, Gilbert could have achieved substantial completion by 14 October 1977, 187 days earlier than it was actually achieved. Defendants O'Brien & Gere and City offered evidence tending to show that throughout the project, Gilbert's rate of progress fell progressively behind the contract schedule due to Gilbert's failure to assign sufficient men and equipment to the project, so that the problems experienced by Gilbert with the key wall leakage had no effect on the overall completion date. Defendants also offered evidence that Gilbert had not installed the piping according to the specifications, that the conventional method of caulking the pipes in the sleeves could have been accomplished, and that a number of the leaks were due to improper caulking. They also offered evidence that a concrete wall, such as this key wall, cannot be designed to avoid all leakage and that Gilbert

knew or should have known, when it submitted its bid and entered the contract, that waterproofing would be necessary in order to comply with the contract requirement for a water tight structure. The engineer who designed the wall testified that he provided for settlement in design of the key wall. Both he and another engineer testified that, in their opinion, differential settlement had not occurred.

In cases where the trial judge sits as the trier of facts, he is required to (1) find the facts on all issues joined in the pleadings; (2) declare the conclusions of law arising on the facts found; and (3) enter judgment accordingly. *Coggins v. City of Asheville*, 278 N.C. 428, 180 S.E. 2d 149 (1971); G.S. 1A-1, Rule 52(a). The facts required to be found are the ultimate facts established by the evidence which are determinative of the questions involved in the action and essential to support the conclusions of law reached. *Quick v. Quick*, 305 N.C. 446, 290 S.E. 2d 653 (1982). The requirement is designed to "dispose of the *issues raised by the pleadings*" and to permit "a reviewing court to determine from the record whether the judgment—and the legal conclusions which underlie it—represent a correct application of the law." *Coble v. Coble*, 300 N.C. 708, 712, 268 S.E. 2d 185, 189 (1980) (emphasis supplied). The court's findings of fact are conclusive on appeal if supported by competent evidence, even though there may be evidence to the contrary. *Williams v. Insurance Co.*, 288 N.C. 338, 218 S.E. 2d 368 (1975).

[3]   In the case before us, the issue of implied warranty of the plans and specifications and the issue of breach of such warranty were clearly raised by the amended pleadings and by conflicting evidence in the record. Specifically, then, the trial court was required to determine whether such a warranty existed (in view of City's assertion that the contract disclaimed warranties), and, if so, whether it had been breached by City. The court's findings and conclusions do not address these issues.

The court found that the key wall was constructed as provided by the plans and specifications, and that by reason of the placement of the pipes, and distances of the flanges from the wall, it was necessary for Gilbert to employ an alternative method of caulking the sleeves. The court also found that random cracks appeared in various areas of the key wall, resulting in leaks, and

that there were leaks from the area between the pipes and the sleeves which had been caulked. These evidentiary findings support Gilbert's contention that the leakage was due to no fault of its own. On the other hand, the court found that Gilbert knew that concrete walls designed in the manner in which the key wall was designed could be expected to develop cracks and to leak. The court also found that no differential settlement "was measured along the key wall." These evidentiary findings support City's contention that the plans and specifications were sufficient for the intended purpose, that leakage could be expected and that Gilbert's obligations under the contract to build a water tight structure contemplated the necessity for waterproofing after the wall was constructed. Thus, though there were evidentiary findings made which could have supported either contention, the court failed to resolve the issue; the judgment contains no specific ultimate finding whether, if an implied warranty did exist in this case, there was a breach of it. The absence of these findings precluded the trial court from determining their legal effect in its conclusions of law as is evident by its failure to include in the judgment any conclusion of law addressing the issue of warranty. In the absence of such findings and conclusion, this court has no means of determining whether the trial court's judgment denying Gilbert's claims against City, based on breach of implied warranty, was correct.

Appellees argue that the trial court's Finding of Fact No. 37, to the effect that O'Brien & Gere's design work was done in accordance with accepted standards, and Conclusion of Law No. 2, that neither O'Brien & Gere nor City were *negligent* in designing the facility, are sufficient to negate the issue of breach of implied warranty and to support the trial court's judgment. We disagree. The cited finding of fact and conclusion of law address the wholly separate issue of negligence, which was raised in the pleadings and decided in favor of appellees. Gilbert has abandoned its exception to the court's resolution of that issue. However, the court's ruling on the issue of negligence in design does not resolve the issue of implied warranty. Although the existence or non-existence of negligence may be pertinent to the issue of breach of implied warranty, it is not conclusive. Damages for breach of implied warranty may be recovered without proof of negligence.

**[4]**  We must, therefore, remand the case to the trial court for a determination of the issues relating to implied warranty. Should the trial court determine that such a warranty existed, and that it was breached by City, resulting in leakage in the key wall, Gilbert would be entitled to recover damages, upon proper proof, for its work performed in order to correct the leaks. Since the repairs would have been necessitated by a breach of implied warranty of the plans, they could not be considered items of extra work or a change in the plans. The trial court's Findings of Fact Nos. 27 and 28, and Conclusion of Law No. 4, relating to Gilbert's failure to comply with contract requirements for payment for extra work, would not bar Gilbert's recovery. On the other hand, should the trial court find that the leakage did not result from any deficiency in the plans and specifications, and that the water-proofing was required as a part of Gilbert's obligations under the contract to construct a water tight structure, Gilbert's failure to comply with the provisions of the contract pertaining to compensation for extra work, as found by the trial court and supported by competent evidence, bars its recovery for additional expenses incurred in waterproofing the key wall.

**[5]**  Our holding, however, does not entitle Gilbert to recover the liquidated damages and engineering fees withheld by City, or to recover for extended overhead expenses. The recovery of these amounts is sought by Gilbert upon its claim that at least a portion of the delay in completing the project was due to the repair of the key wall. That issue has been properly resolved against Gilbert by the trial court. The court's Conclusion of Law No. 3, excepted to by Gilbert, finds that the cause for delay in completion of the contract resulted from the acts and omissions of Gilbert. Although denominated a conclusion of law, it is, in reality, an ultimate finding of fact by the court in that it was "reached by processes of logical reasoning from the evidentiary facts" and not by application of fixed rules of law. *Quick, supra* at 451, 290 S.E. 2d at 657-58, *quoting Woodard v. Mordecai*, 234 N.C. 463, 472, 67 S.E. 2d 639, 645 (1951). Although the evidence on this point was conflicting, the finding is supported by competent evidence. Don Griffin, project manager for O'Brien & Gere, testified at length about the various delays by Gilbert in completion of the project due to causes not associated with the problems encountered with the key wall, and rendered his opinion that the key wall problems

did not delay the overall completion of the project. The finding is therefore conclusive and Gilbert's exception is overruled. *Williams v. Insurance Co.*, *supra.* We affirm the holding of the trial court denying Gilbert's recovery in these claims.

## II.   O'BRIEN & GERE'S APPEAL

O'Brien & Gere appeal from the trial court's judgment awarding Gilbert recovery of $284.70 for relocating an electric line and $7,073.00 for repairs to chemical feedlines and valves, made necessary by fault in design. O'Brien & Gere contends that there was no evidence to support the court's Conclusion of Law No. 8, that the electric line was relocated at O'Brien & Gere's request, or Conclusion of Law No. 9, that the repairs to the chemical line and valves were done at Gere's request and were occasioned by fault in design. At oral argument, Gilbert conceded that O'Brien & Gere was entitled to prevail on these points. We have examined the record and agree that neither of these conclusions are supported by the findings of fact or by evidence in the record.

As to Gilbert's appeal, the judgment of the trial court is:

Affirmed in part and remanded for further proceedings consistent with this opinion.

As to O'Brien & Gere's appeal, the judgment of the trial court is:

Reversed.

Judges BECTON and JOHNSON concur.