DESIGN PLUS STORE FIXTURES, INC., PLAINTIFF, v. CITRO CORPORATION AND ANTHONY CITRO, DEFENDANTS, AND CITRO CORPORATION AND ANTHONY CITRO, THIRD PARTY PLAINTIFFS v. DECOLAM, INC. (FORMERLY KNOWN AS WOODTEK, A DIVISION OF CRA-GEN, INC.), THIRD PARTY DEFENDANT

No. COA98-29

(Filed 15 December 1998)

**1. Uniform Commercial Code— installment contract—defective goods—acceptance**

The trial court did not err in an action arising from a contract to produce display tables by concluding that plaintiff-Design had accepted two installments and awarding defendant-Citro damages in the amount of the contract price for those goods, less an offset for damages sustained by Design by reason of defects, where Design had entered into a contract with Citro to buy display tables in three installments; Citro subcontracted with Decolam, the third-party defendant, to edge-tape and bore holes in parts according to plaintiff's specifications and a pattern approved by Citro; the tables for the first two orders were delivered late and non-conformities made it impossible to assemble the tables; Citro offered no cure and Design eventually re-drilled the holes and assembled the tables; Design consummated the sale to its customer (Springmaid) with the understanding that the tables would ultimately be replaced; Design covered the cost of the replacements and refused to pay Citro for the defective tables; and Design ultimately gave the defective tables to charity and canceled the remaining installment. Repairing the tables and allowing its customer the continued use of the tables were reasonable actions in good faith by Design and did not constitute acceptance of the tables; however, giving the tables to charity without notifying Citro was an act inconsistent with Citro's ownership, so that Design is deemed to have accepted the goods.

DESIGN PLUS STORE FIXTURES, INC. v. CITRO CORP.

[131 N.C. App. 581 (1998)]

## 2. Uniform Commercial Code— anticipatory repudiation— display tables—defects in two of three shipments—ease of cure of future defects

The trial court erred in an action arising from a contract to produce display tables by concluding that plaintiff breached the whole contract by an anticipatory repudiation where the contract was for three installments; non-conformities individually and cumulatively substantially impaired the contract as a whole; defendant-Citro offered no cure of the defects; and plaintiff-Design bore the expense of repairing the tables in order to meet a deadline known to both parties. The trial court should not have considered the ease of remedying defects of the future installment when determining whether the past installments substantially impaired the contract as a whole.

## 3. Uniform Commercial Code— subcontractor—contractor's materials and specifications—defective

The trial court erred in an action arising from a contract to produce display tables by concluding that the third-party defendant, Decolam, was liable to Citro, the original defendant and third party plaintiff, where the original plaintiff, Design, had contracted with Citro for the tables, Citro subcontracted with Decolam to edge-tape and bore holes in the parts, and the tables produced were late and could not be assembled. The trial court found that Decolam used materials and specifications provided by the contractor, that the materials and specifications were defective, and that these defects were the proximate cause of the deficiency. Decolam was entitled to the implied warranty that the materials and specifications provided by Citro were free of defects.

Appeal by plaintiff and third party defendant from judgment entered 13 June 1997 by Judge John M. Gardner in Mecklenburg County Superior Court. Heard in the Court of Appeals 21 October 1998.

*Cecil M. Curtis for plaintiff-appellant.*

*No brief filed for defendant-appellee.*

*James, McElroy, & Diehl, P.A., by Lawrence W. Hewitt and Fred B. Monroe, for third party defendant-appellant.*

MARTIN, John C., Judge.

Plaintiff, Design Plus Store Fixtures, Inc., (Design), entered into a contract with defendant, Citro Corporation (Citro), to buy display tables in three installments to be delivered to Design's primary customer, Springmaid, in Oregon, Kansas, and New Mexico. Citro subcontracted with the third party defendant, Decolam, Inc., (Decolam), to "edge-tape" and bore holes in the parts according to plaintiff's specifications and a pattern approved by Citro.

The tables for the first two orders were delivered late, and a number of non-conformities made the tables impossible to assemble. When Design notified Citro of the defects, Citro offered no cure. Despite the non-conformities, Design eventually re-drilled the holes and assembled the tables. Design consummated the sale to Springmaid with the understanding that the tables would ultimately be replaced. Design covered the cost of the replacement tables, and refused to pay Citro for the defective tables. After Design provided replacement tables to Springmaid, Design gave the defective tables to charity. Design canceled the New Mexico installment after the table parts were cut and before they were bored or taped.

Design sued for expenses incurred due to Citro's breach. Citro counterclaimed for breach of contract and unjust enrichment, and filed a third party complaint against Decolam for breach of warranties and contract. The trial court found that Design had accepted the goods and awarded Citro $19,404.00 as damages for Design's breach of contract, less $18,420.17, which the court offset as Design's damages occasioned by Citro's breach of warranty. The trial court also awarded Citro $9,404.64 as damages for Design's anticipatory repudiation of the New Mexico installment, and awarded Citro $7,407.84 for Decolam's breach of subcontract and breach of warranty. Plaintiff Design and third party defendant Decolam appeal.

## I. Plaintiff's Assignments of Error

Design contends it never accepted the Oregon and Kansas orders despite its repair, continued use, and ultimate discarding of the defective tables. In addition, Design argues that the first two non-conforming installments delivered by Citro substantially impaired the value of the whole contract; thus, Design contends it did not anticipatorily repudiate the contract and was entitled to immediately cancel the last installment, the New Mexico order. We reject Design's first contention, but find merit in the second.

## A. Acceptance of Oregon and Kansas Installments

[1] Design's transaction with Citro is governed by the Uniform Commercial Code (Code), N.C. Gen. Stat. §§ 25-2-102, 25-2-105 (1995). Specifically, this is an installment contract subject to the provisions of G.S. § 25-2-612(1) (1995) ("An 'installment contract' is one which requires or authorizes the delivery of goods in separate lots to be separately accepted . . . ").

Initially, Design properly rejected the tables by providing reasonable notice of the nonconformity to Citro. Rejection of an installment, under section 2-612, is appropriate only if "the nonconformity substantially impairs the value of that installment . . . ." N.C. Gen. Stat. § 25-2-612(2) (1995). A proper rejection also requires (1) rejection within a reasonable time after delivery or tender, and (2) seasonable notice to seller. N.C. Gen. Stat. § 25-2-602 (1995); HPS, Inc. v. All Wood Turning Corp., 21 N.C. App. 321, 204 S.E.2d 188 (1974). The trial court found that the non-conformities "made it impossible to properly assemble the table," and that this constituted a substantial impairment, justifying rejection of the installments. The trial court also noted that Design "arguably communicated a valid intent to reject the goods to [Citro]." Design notified Citro of significant non-conformities on 10 November 1993; and after Citro made no offer to cure the defects, Design refused to pay for the defective tables on 21 November 1993. Thus, Design's actions after discovery of the non-conformities were consistent with a rightful rejection of the tables. Nevertheless, the trial court concluded that Design had accepted the tables by actions "inconsistent with [Citro's] ownership," including: consummating the sale of the tables to Springmaid with concessions, and "failure to replace the Oregon tables for eleven months and the Kansas tables for nineteen months, and the Plaintiff's disposal of the tables after their replacement without notifying or attempting to obtain the consent" of Citro.

"Acceptance of goods occurs when the buyer . . . does any act inconsistent with the seller's ownership; but if such act is wrongful against the seller, it is an acceptance only if ratified by him." N.C. Gen. Stat. § 25-2-606(1)(c) (1995). "Acts inconsistent with the seller's ownership" can best be understood in light of the buyer's statutory options and duties with respect to rightfully rejected nonconforming goods. The buyer's options and duties upon rejection are described in G.S. §§ 25-2-602 to -604 (1995). For most buyers, there is a general duty to hold goods with reasonable care "for

a time sufficient to permit the seller to remove them." N.C. Gen. Stat. § 25-2-602(2)(b) (1995). Merchant buyers have a more specific duty when the seller has no agent or place of business in the market of rejection:

> a merchant buyer is under a duty after rejection of goods in his possession or control to follow any reasonable instructions received from the seller with respect to the goods and in the absence of such instructions to make reasonable efforts to sell them for the seller's account if they are perishable or threaten to decline in value speedily.

N.C. Gen. Stat. § 25-2-603(1) (1995). In this case, Design is a merchant dealing in tables, G.S. § 25-2-104(1) (" 'Merchant' means a person who deals in goods of the kind . . . "); and Citro had no place of business or agent in the markets of rejection, Oregon and Kansas. In addition, the tables are not "perishables" such that "the value of the goods is threatened and the seller's instructions do not arrive in time to prevent serious loss." N.C. Gen. Stat. § 25-2-603(1) Official U.C.C. Comment 1 (1995). Thus Design's duty, upon rejection, was to follow Citro's reasonable instructions with respect to Citro's tables. However, no instructions from Citro were forthcoming.

Absent such instructions, the statute presents three options for a buyer who has given reasonable notification rejecting non-conforming goods: (1) store the rejected goods on the seller's account, (2) reship them to seller, or (3) resell them on the seller's account with reimbursement for expenses incurred in caring for and selling them. N.C. Gen. Stat. § 25-2-604 (1995). These potential courses of action are "intended to be not exhaustive but merely illustrative." N.C. Gen. Stat. § 25-2-604 Official U.C.C. Comment 1 (1995).

> The basic purpose of this section is twofold: on the one hand it aims at reducing the stake in dispute and on the other at avoiding the pinning of a technical "acceptance" on a buyer who has taken steps towards realization on or preservation of the goods in good faith.

N.C. Gen. Stat. § 25-2-604 Official U.C.C. Comment (1995); *see generally, Frank's Maintenance & Engineering, Inc., v. C.A. Roberts Co.*, 86 Ill.App.3d 980, 987, 408 N.E.2d 403, 408 (1980) ("In determining whether a buyer has so wrongfully exercised ownership over goods as to be barred from rejecting them, court must apply rule of reasonableness.")

DESIGN PLUS STORE FIXTURES, INC. v. CITRO CORP.

[131 N.C. App. 581 (1998)]

A merchant buyer in possession of rejected goods, and without instructions from the seller, is in the somewhat difficult position of having a choice of reasonable options but no clear affirmative duties with respect to those goods, G.S. § 25-2-604; yet, the buyer must avoid acts "inconsistent with the seller's ownership" in order to avoid accepting the non-conforming goods. N.C. Gen. Stat. § 25-2-606(1)(c) (1995). The issue is whether Design's actions constitute good faith steps toward "realization on or preservation of the goods," on the one hand, or "acts inconsistent with ownership" on the other. *Compare*, N.C. Gen. Stat. § 25-2-604 Official U.C.C. Comment (1995) and N.C. Gen. Stat. § 25-2-606(1)(c) (1995). Whether actions taken with respect to rejected non-conforming goods, beyond those suggested by statute, are "inconsistent with the seller's ownership," depends on the circumstances and the buyer's steps towards realization on or preservation of the goods in good faith.

The repair and continued use of the non-conforming, rejected goods constitutes a reasonable good faith effort to preserve the goods while mitigating damages. *Accord Hajoca Corp. v. Brooks*, 249 N.C. 10, 15, 105 S.E.2d 123, 127-28 (1958) (retention and use of defective machine by purchaser did not waive rejection because "purchaser does not waive his right to rescind the contract for breach of warranty 'where the retention was at the instance and request of the seller and for the benefit of the seller in his endeavors to remedy the defective machine so that it would properly perform the functions for which it was warranted and sold.' ") (citation omitted); *Davis v. Colonial Mobile Homes*, 28 N.C. App. 13, 18, 220 S.E.2d 802, 805 (1975), *disc. review denied*, 289 N.C. 613, 223 S.E.2d 391 (1976) ("The fact that plaintiff stayed in the unit after allegedly revoking or rejecting the unit does not alone necessarily vitiate any of the buyer's rights."); *Romy v. Picker Int'l Inc.*, 1992 W.L. 70403, 3 (E.D.Pa. 1992), *affirmed*, 986 F.2d 1409 (3rd Cir. (Pa) 1993) ("use of nonconforming goods, however, does not constitute, per se, a waiver of revocation; . . . [r]ather, a court will annul a revocation and conclude that a re-acceptance has occurred only where the buyer's actions with respect to the goods are deemed 'unreasonable.' "); *Fablok Mills, Inc., v. Cocker Machine & Foundry Co.*, 125 N.J.Super. 251, 257-58, 310 A.2d 491, 494-95, *cert. denied*, 64 N.J. 317, 315 A.2d 405 (1973) ("We conceive that in certain situations continued use of goods by the buyer may be the most appropriate means of achieving mitigation, i.e., where the buyer is unable to purchase a suitable substitute for the goods.").

Thus it has been frequently held that under certain circumstances a buyer rejecting goods or revoking his acceptance may continue to use the goods . . . particularly where such use is a direct result of the oppressive conduct of the seller . . . or where no prejudice is shown (citations omitted).

*Frank's Maintenance & Engineering, Inc., v. C.A. Roberts Co.*, 86 Ill.App.3d 980, 986-87, 408 N.E.2d 403, 408 (1980).

In this case, Citro entered into the contract with the understanding that manufacturing and delivering the tables in a timely manner was necessary to serve Design's primary customer, Springmaid. Citro delivered the tables late, and the tables were defective. According to the trial court's findings of fact, the plaintiff "performed corrective measures" on the tables, and provided them to Springmaid with the understanding they would be replaced and "replacement of the tables could not affect any of the scheduled store openings;" and, Citro "offered neither explanation nor solution." Design bore the expense of repairing the tables for temporary use by Springmaid. Citro offered no instructions as to the disposal or return of the tables. Under these circumstances, we hold that repairing the tables and allowing Springmaid the continued use of the tables were reasonable actions in good faith and did not constitute acceptance of the tables.

However, after allowing Springmaid the reasonable continued use of the repaired tables, Design gave the nonconforming tables away, contending they had no market value. The trial court concluded, *inter alia*, that "disposal of the tables after their replacement without notifying or attempting to obtain the consent of [Defendant] Corporation constituted acceptance of the goods under the code as acts inconsistent with Defendant's ownership." We agree.

As discussed above, reasonable repair and use of the tables to temporarily satisfy a contract contemplated at the time of the transaction is not inconsistent with ownership; thus those actions did not constitute an acceptance. However, discarding the tables without notifying Citro is an unreasonable act, inconsistent with ownership, where the tables had some salvageable value. Underlying the issue of acceptance, in this context, is the question of whether Design acted inconsistently, by rejecting the goods and then disposing of these goods as an owner. Giving the tables to charity without notifying Citro was such an act of ownership.

There are some circumstances where it might be reasonable to discard rejected goods when there is no salvageable value. N.C. Gen. Stat. § 25-2-608, Official U.C.C. Comment 6 (1995) ("Worthless goods, however, need not be offered back . . . ."); *Askco Engineering Corp., v. Mobil Chemical Corp.*, 535 S.W.2d 893 (Tex. Civ. App. 1976). In this case, however, the court found that the un-bored, un-edged, parts for the New Mexico installment had a salvage value of $15.60 per table; and its finding is supported by the evidence. Plaintiff concedes in its brief that the assembled and used tables of the Kansas and Oregon installments had the same salvage value as the unassembled, un-edged parts of the New Mexico installment; and so these tables were not worthless. Discarding these goods constituted an act inconsistent with Citro's ownership, and so Design is deemed to have accepted the goods. N.C. Gen. Stat. § 25-2-606(1)(c), 25-2-604, Official U.C.C. Comment (1995). We therefore affirm the trial court's conclusion that Design accepted the Kansas and Oregon installments and its award of damages to Citro in the amount of the contract price for those goods, less an offset for damages sustained by Design by reason of the defects. N.C. Gen. Stat. § 25-2-607(1) (1995).

### B.  Cancellation of New Mexico Installment

[2] Design also argues that cancellation of the New Mexico order was justified, because the defects of the first installments substantially impaired the value of the contract as a whole. The trial court concluded, to the contrary, that "[t]he non-conformities with respect to the Oregon and Kansas tables did not substantially impair the value of the whole contract" because Citro, once notified of the defects, could have easily remedied the final installment. The trial court erred in considering the ease of remedying future installments when determining whether past installments impaired the contract as a whole.

"Whenever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole." N.C. Gen. Stat. § 25-2-612(3) (1995). "Substantial impairment," as explained by the official commentary to section 2-612(2), involves consideration of the quality, quantity, and assortment of goods, as well as the time frame contemplated by the contract. Official U.C.C. Comment 4 (1995). "It must be judged in terms of the normal or specifically known purposes of the contract." *Id.* Once a non-conforming installment substantially impairs the installment contract as a whole, the aggrieved party has no duty to

provide an opportunity to cure the defects of future installments; rather, the buyer has an immediate right to cancel the entire contract.

Whether the non-conformity in any given installment justifies cancellation as to the future depends, not on whether such non-conformity indicates an intent or that the future deliveries will also be defective, but whether the non-conformity substantially impairs the value of the whole contract. If only the seller's security in regard to future installments is impaired, he has the right to demand adequate assurances and proper future performance but has not an immediate right to cancel the entire contract. It is clear under this Article, however, that defects in prior installments are cumulative in effect, so that acceptance does not wash out the defect "waived."

N.C. Gen. Stat. § 25-2-612(2) & (3) Official U.C.C. Commentary, Comment 6 (1995).

Non-conformities in the Oregon and Kansas installments, individually and cumulatively, substantially impaired the contract as a whole. The tables of the first installments were impossible to assemble and were delivered late. The tables were not usable as delivered to Design. Citro offered no cure of the defects and Design bore the expense of repairing the tables in order to meet a deadline known to both parties. The trial court should not have considered the ease of remedying defects of the future installment when determining whether the past installments substantially impaired the contract as a whole; consequently, the trial court erred in its conclusion of law that plaintiff breached by immediately canceling the whole contract and was liable for damages of $9,404.64 for the anticipatory repudiation. We reverse this portion of the trial court's judgment and remand the case for a determination of damages owed by Citro to Design for breach of contract with respect to the New Mexico installment.

## II. Third Party Defendant's Assignments of Error

[3] The trial court found that Citro contracted with Decolam to bore holes and edge tape pre-cut pieces of wood. Design provided specifications to Citro who relayed them to Decolam. Decolam prepared a boring pattern in accordance with these specifications and furnished the pattern to Citro. Citro subcontracted with a non-party, Sumpter Lumber, to cut the pieces, and checked the pieces for "accuracy and squareness in cut, flatness, and measurements" before delivering the precut parts to Decolam at 3:00 p.m. on 5 November 1993. The trial

court found that Decolam worked through the night, and completed the job by 7:00 a.m. on 6 November 1993. Citro was in a rush to complete the parts because they had already missed Design's delivery deadline of 1 November 1993. The trial court found that the pieces were mis-sized when they were delivered to Decolam, in that the top shelf was cut wider than the specifications, and "because of the mis-sized parts, the bored holes did not properly align and the tables could not be properly assembled."

Despite the fact that Citro provided the specifications and the precut parts to Decolam, under a strict time limitation, the trial court concluded that Decolam breached the contract with Citro by failing to perform the work in a workmanlike manner. We disagree. Given the trial court's findings, Decolam, the subcontractor, is not liable for defects when the parts and specifications are provided by the general contractor.

"[A] subcontractor is not liable to his contractor for using the contractor's materials and following the contractor's instructions." *Raynor Steel Erection v. York Const. Co.*, 83 N.C. App. 654, 656, 351 S.E.2d 136, 137-38 (1986); *Bd. of Education v. Construction Corp.*, 50 N.C. App. 238, 241, 273 S.E.2d 504, 506-07 ("[T]he law in general is that where a contractor is required to and does comply with the plans and specifications prepared by the owner or the owner's architect, the contractor will not be liable for the consequences of defects in the plans and specifications."), *disc. review improv. granted*, 304 N.C. 187, 282 S.E.2d 778 (1981). The rationale behind this rule is that "there is an implied warranty" by the contractor that the plans, specifications, and materials "are free of defects and that the contractor's compliance with them will ensure a correct result." *Butler & Sidbury, Inc., v. Green Street Baptist Church*, 90 N.C. App. 65, 67, 367 S.E.2d 380, 382 (1988); *City of Charlotte v. Skidmore, Owings, and Merrill*, 103 N.C. App. 667, 407 S.E.2d 571 (1991); *Gilbert Engineering Co. v. City of Asheville*, 74 N.C. App. 350, 328 S.E.2d 849, *disc. review denied*, 314 N.C. 329, 333 S.E.2d 485 (1985); *George v. Veach*, 67 N.C. App. 674, 313 S.E.2d 920 (1984); *Greensboro Housing Authority v. Kirkpatrick & Assoc., Inc.*, 56 N.C. App. 400, 289 S.E.2d 115 (1982); *Bd. of Education v. Construction Corp., supra.*

To take advantage of this implied warranty, the subcontractor must "prove that (i) the plans and specifications were adhered to, (ii) they were defective, and (iii) the defects were the proximate cause of

the deficiency in the completed work." *City of Charlotte v. Skidmore, Owings, and Merrill*, 103 N.C. App. at 679, 407 S.E.2d at 579 (citing *Gilbert Engineering Co. v. City of Asheville*, 74 N.C. App. 350, 362-63, 328 S.E.2d 849, 857 (1985)). In this case the trial court found that the subcontractor, Decolam, used the materials and specifications provided by the contractor, that the materials and specifications were defective, and that these defects were the proximate cause of the deficiency. Therefore, Decolam was entitled to the implied warranty that the materials and specifications provided by Citro were "free of defects and that the [sub]contractor's compliance with them will ensure a correct result." The trial court's conclusion that Decolam is liable to Citro for breach of contract was therefore error.

For the reasons stated above, the trial court's judgment awarding Citro the contract price of $19,404.00 for the tables accepted, less an offset of $18,420.17 as damages by reason of it breach due to the tables' non-conformity to the contract, is affirmed. The judgment awarding Citro $9,404.64 for the anticipatory repudiation of the New Mexico installment is reversed and the case is remanded for a determination of Design's damage claim for replacement costs on this installment. The judgment awarding Citro $7,407.84 for third party defendant Decolam's breach of sub-contract and warranties is reversed.

Affirmed in part, reversed in part, and remanded.

Judges TIMMONS-GOODSON and HORTON concur.