CITY OF CHARLOTTE v. SKIDMORE, OWINGS AND MERRILL, WEISS BROS. CONSTRUCTION CO., INC., AND FIDELITY AND DEPOSIT COMPANY OF MARYLAND

WEISS BROS. CONSTRUCTION CO., INC. v. HANOVER-PREST PAVING CO.

No. 9026SC527

(Filed 20 August 1991)

1. **Architects § 10 (NCI4th) — urban streetscape — contractor's deviation from specifications — failure to show deviation — action against designer not dismissed**

In an action for breach of contract and breach of implied warranty against the designer of an urban streetscape, the trial court did not err in denying defendant designer's motions for directed verdict and judgment n.o.v. made on the ground that defendant construction company materially deviated from defendant designer's specifications, since defendant designer's letter to plaintiff about how much water to use in the setting beds under the sidewalks and crosswalks indicated that sufficient water should be added to a cement and sand mixture "to permit the bed to be screeded and trowelled as necessary"; the letter indicated that completely dry sand-cement mix incapable of being screeded did not meet the specifications; defendant construction company judged that inherent moisture in the sand was sufficient without adding extra water; the beds were in fact screeded and trowelled; and the separation of sand and cement in the setting beds was not shown until sometime after defendant construction company had left the site and could have derived from natural causes.

**Am Jur 2d, Architects § 23.**

**Responsibility of one acting as architect for defects or insufficiency of work attributable to plans. 25 ALR2d 1085.**

2. **Architects § 10 (NCI4th) — urban streetscape design — defective design — deviation from specifications by contractor — designer not insulated from liability**

In an action for breach of contract and breach of implied warranty against the designer of an urban streetscape, there was no merit to defendant designer's contention that a material deviation from the specifications by defendant construction

company would have completely insulated defendant designer from liability for defective specifications, since the law in North Carolina is that proof of a contractor's deviation simply creates a *prima facie* case as to causation which a contractor may rebut by proving that the damage was not in fact caused by the deviation.

Am Jur 2d, Architects § 23.

Responsibility of one acting as architect for defects or insufficiency of work attributable to plans. 25 ALR2d 1085.

3. Architects § 10 (NCI4th)— contractor's deviation from contract—plaintiff's acquiescence—recovery against contractor barred—recovery from designer not barred

The fact that plaintiff's acquiescence in a deviation from specifications barred its recovery from defendant contractor did not bar plaintiff's recovery from defendant designer or absolve defendant designer from paying any portion of the recovery notwithstanding defendant designer's liability; therefore, the trial court did not err in denying defendant designer's motion for judgment n.o.v., but properly granted a new trial on the damages issue after realizing that jury instructions had been inadequate to guide the jury in making distinctions with respect to damages for the setting beds and the pavers and as between the first two crosswalks laid and subsequent crosswalks.

Am Jur 2d, Architects § 23.

Responsibility of one acting as architect for defects or insufficiency of work attributable to plans. 25 ALR2d 1085.

4. Contracts § 172 (NCI4th)— mall construction contract— defective sidewalks—measure of damages—instructions proper

In an action for breach of contract and breach of implied warranty against the designer of an urban streetscape, the trial court did not err in its instruction to the jury on the measure of damages for sidewalks where the court instructed that plaintiff was entitled to recover the cost of replacement of or repair to the sidewalks, less salvage value of any parts replaced, since the defects in the sidewalks were not minor; the sidewalks did not conform to the contract; although a substantial amount of the work on the sidewalks would have

to be destroyed, replacement of the sidewalk would not result in economic waste to the mall project; and the evidence did not support an instruction on the value measure of damages.

**Am Jur 2d, Architects § 24.**

**Responsibility of one acting as architect for defects or insufficiency of work attributable to plans. 25 ALR2d 1085.**

APPEAL by defendant Skidmore, Owings and Merrill and by plaintiff City of Charlotte from judgment entered 19 December 1989 by *Judge John M. Gardner* in MECKLENBURG County Superior Court. Heard in the Court of Appeals 4 December 1990.

*Moore & Van Allen, by Jeffrey J. Davis, Charles E. Johnson, and Margaret Ann Behringer, for plaintiff-appellant/appellee City of Charlotte.*

*Kirkland & Ellis, by Helen E. Witt and Jeffrey L. Willian, and Parker, Poe, Adams & Bernstein, by Gaston H. Gage, for defendant-appellant/appellee Skidmore, Owings & Merrill.*

*Waggoner, Hamrick, Hasty, Monteith, Kratt & McDonnell, by S. Dean Hamrick, for defendant-appellees Weiss Bros. Construction Co., Inc., and Fidelity and Deposit Company of Maryland.*

PARKER, Judge.

I.

This is a civil action for breach of contract and breach of implied warranty. Desiring to upgrade and beautify downtown Charlotte, North Carolina, plaintiff on 11 January 1982 contracted with defendant Skidmore, Owings and Merrill ("SOM") to design an urban streetscape to be known as Tryon Street Transit Mall. The mall was to cover eleven city blocks, nine on Tryon Street and two on Trade Street. Defendant SOM's design provided for a system of sidewalks, crosswalks, roadways, storm drainage, curbing, bus shelters, benches, light posts, and trash receptacles. The plan included reducing vehicular traffic on Tryon Street from six lanes to four and widening sidewalks to encourage pedestrian traffic. Plaintiff eventually paid $7,967,772.70 for construction of the mall.

On 22 November 1983, plaintiff contracted with defendant Weiss Brothers Construction Company, Inc., ("Weiss") to do the actual work of constructing the mall. The work included removing the

old curbs and gutters and installing new granite curbing and taking up the old concrete sidewalks and laying new and bigger sidewalks. In addition, the streets were newly paved and new pedestrian crosswalks harmonious with the design of the sidewalks were installed. Defendant Weiss also installed a new electrical system.

Defendant SOM's design called for the use of granite and concrete blocks ("pavers"), eighteen inches square, in the mall sidewalks and crosswalks. The pavers in the central area of the mall were pink; those in other areas were in two shades of grey. Underneath all the pavers were setting beds supported by eleven-inch concrete subslabbing. The sidewalks were designed to bear only pedestrian traffic and were constructed of pavers two inches thick, but. crosswalks ·and driveways were designed to withstand vehicular traffic and used three-inch pavers. In addition, some pavers laid over utility vaults were only one inch thick. The original contract specifications for setting beds included the following:

> 1. Pedestrian areas (General): Portland cement/sand bed with latex additive bond coat for setting pavers such as Laticrete 4237 or Tec-crete by Fuller Co.
>
> 2. Pedestrian areas (minimum depth): Thinset sand/cement mortar mix.
>
> 3. Vehicular areas (roadway and drives): Liquid latex additive as above, Portland cement/sand bed with cement/latex additive bond coat for setting pavers.

The sand-cement bed was to be two inches thick in vehicular areas and one inch thick in pedestrian areas. Setting bed materials were to be (i) spread evenly over the entire area to be paved and (ii) screeded to a minimum level that would provide the minimum thickness indicated when the pavers had been put in place. Other contract specifications as to granite paving listed materials in the setting beds but included only Portland cement, sand, and a latex additive bond coat. Instructions as to execution of granite paving included the following:

> B. *Granite paving*:
>
> > 1. Setting Bed: The sand/cement bedding course shall consist of sand and Portland Cement in the proportions of one (1) part cement and three (3) parts sand by volume, mixed dry until the mass is of uniform color. Mixing may

be done in an approved batch mixer or by hand on a clean type surface. The bedding course of moist mortar shall be placed and shaped upon the base so that finish depth shall not be less than as indicated. The bedding shall be shaped to a true surface, parallel with the surface of the finished paving by means of a template and the bed shall be struck off until proper alignment is secured. After final shaping, the bedding shall not be disturbed prior to applying the latex additive bond coat and laying the stone.

2. *Latex Additive Bond Coat*: apply in accordance with the manufacturer's instructions and recommendations and as approved.

According to the contract between plaintiff and defendant SOM, all plaintiff's instructions to the contractor were to be issued through SOM. SOM was to make monthly trips to the project site to observe construction activities, render decisions in the field, and interpret drawings during construction. SOM was to "endeavor to guard [plaintiff] against defects and deficiencies in the work of the Contractor" but was not required to make exhaustive or continuous on-site observations to check the quality or quantity of the work. Although under the proposed contract SOM was to provide a full time site representative, this provision did not appear in the final agreement. The contract provided that SOM's observations did not render it responsible for construction means, methods, techniques, or procedures or for the contractor's failure to carry out the work in accordance with the contract documents. Supplementary conditions to the specifications for the project generally reiterated that SOM would not have control or charge of such matters. SOM agreed to perform all services under the contract "in conformity with the standards of reasonable care and skill of [its] profession."

## A. Setting Bed Problems

Construction of the project began in January of 1984. Defendant Weiss prepared two crosswalk setting beds by mixing sand and cement in a ratio of three to one. No additional water or other wetting agent was added. When defendant Weiss began to lay pavers in these crosswalk setting beds, the latex bond coat called for by the contract specifications would not adhere to the sand-cement mixture. Discussions of two issues ensued among representatives of plaintiff and defendants SOM and Weiss.

First, as to latex, it became clear that defendant Weiss did not believe the contract specifications required latex as an additive in any of the setting beds. Plaintiff asked defendant SOM to determine whether latex was needed. Defendant SOM's representative eventually told plaintiff's representative that all use of latex, as additive or bond coat, could be omitted.

The second issue involved how much water to use in preparing the setting beds. After a meeting on 10 May 1984, SOM wrote to plaintiff as follows:

> In response to your requests of May 3, 1984[,] and May 10, 1984[,] to confirm the proper setting bed for the precast concrete and granite pavers, we have contacted the National Building Granite Quarries Association, National Concrete Masonry Association, paving manufacturers, granite fabricators, latex additive manufacturers, contractors, [and] our consultants, and have examined this item within SOM and have the following recommendation:
>
> > 1. The setting bed for the pedestrian and vehicular areas should consist of a "dry sand-cement" setting bed at the specified 3/1 ratio with sufficient water added to the mix to permit the bed to be screeded and trowelled as necessary. Thoroughly mix the sand and cement to a visually uniform color consistency throughout. Guage [sic] the sand-cement setting bed with a sufficient quantity of water to bring the setting bed materials to the proper consistency for placing the pavers. The 1″ setting beds for the pedestrian areas should remain as per the contract documents. The 2″ setting beds for the vehicular traffic areas should remain as per the contract documents.
>
> We have been advised on May 11, 1984[,] by Jim McChesney of Weiss Brothers Construction Corporation that the labor and material credit for the deletion of the latex additive bond coat is $37,879.00.
>
> . . . .
>
> We observed the installation of portions of the precast concrete pavers at the Marriott while on site Thursday, May 10, 1984. At the west end of the north side of Trade Street, in front of the Marriott, the pavers were not being installed properly.

Specifically, the sand-cement mix was completely dry and was not, therefore, able to be screeded or properly prepared. This is not an acceptable installation and does not meet the intent of the documents or our position as stated herein. This was brought to the attention of the Contractor.

Even after plaintiff received this letter and sent a copy to defendant Weiss, water continued to be an issue. Plaintiff asked defendant SOM for an exact measure of the water required by the new instructions, but SOM would not state an exact quantity. At the end of May, representatives of plaintiff, defendant SOM, defendant Weiss, and the latter's paving subcontractor, Coastal Contractors, again discussed water. Hydration, the chemical process whereby cement reacts with water to form a solid mass, was also discussed. Defendant SOM indicated water sufficient to cause hydration to start needed to be added to the setting bed mixture. The precise amount of water necessary to effect hydration would vary, according to the amount of inherent moisture in the sand used and on-site environmental conditions, and had to be judged by the contractor.

## B. Crosswalks

In the first two crosswalk setting beds prepared by defendant Weiss, the only water came from inherent moisture in the sand, which was at least sufficient to permit the beds to be trowelled and screeded. Soon after these crosswalks were opened to traffic in June of 1984, they began to deteriorate. The pavers began to tip, rock, and move against each other under heavy traffic loads. Defendant SOM again advised that water sufficient to cause the setting beds to work, or hydrate, must be used. Defendant Weiss began to experiment to determine how much water to use in the remaining crosswalk setting beds. In September of 1984, two of defendant SOM's employees were present when defendant Weiss installed at a third crosswalk a setting bed mixture of sand, cement, and water premixed and poured from a cement mixing truck. Afterward, one of the SOM employees wrote that the finished results were very good. Defendant Weiss installed the rest of the mall crosswalks on setting beds of sand, cement, and water premixed and poured from cement mixing trucks.

At first the crosswalks with poured setting beds seemed more durable than those laid over "dry" setting beds. Nevertheless, sometime after the mall opened, crosswalks over the poured setting beds also began to fail. Vehicular traffic over the crosswalks caused

the pavers to crack and to jump out of the setting beds. Loose pavers emitted a hollow, clanging sound when cars passed over them. In 1985, all the crosswalks were replaced with scored concrete designed to harmonize with the appearance of the rest of the mall. The replacement crosswalks were designed according to specifications prepared by defendant SOM.

### C. Sidewalks

Defendant Weiss installed the mall sidewalks over setting beds similar to those used in the first two crosswalks. No wetting agent was included other than moisture inherent in the sand. Over time the sidewalks also failed. From late 1984 until the time of trial, pavers cracked, broke, buckled, and came loose from the setting beds. Defendant Weiss had to reset and level pavers as part of its warranty obligation under its contract. After defendant Weiss left the mall in 1985, the sidewalks continued to deteriorate. Plaintiff's employees performed maintenance on them, which over the five year period leading up to the time of trial included replacing 400 to 500 cracked, broken, and uneven pavers and resetting hundreds of others. The total number of pavers used in constructing all mall sidewalks was about 80,000.

Plaintiff continually reset or replaced pavers which represented a safety hazard. Whether a paver was replaced or merely reset, it was first pried out of the setting bed. The old setting bed was removed and a new setting bed laid. New setting beds consisted of sand and cement in a ratio of three to one, gauged with water sufficient to effect hydration. Each paver took one worker approximately thirty-five to forty-five minutes to replace. Under many of the pavers, plaintiff's employees found inconsistently mixed sand and cement.

Plaintiff had not replaced the sidewalks at the time of trial but presented evidence of the cost of replacement of the sidewalks. Plaintiff's expert testified that the construction cost of replacing the sidewalks with an adequately designed system would be $2,577,000.00. Plaintiff also incurred additional costs of $79,191.82 for the sidewalk replacement design and $34,497.00 for testing of the defective sidewalks.

Testimony by plaintiff's expert witnesses showed that as to crosswalks and sidewalks, defendant SOM's design was defective. William Perenchio, an expert in paving system designs and in the

properties of Portland cement, testified that (i) the design failed to provide for protection against freeze-thaw cycles; (ii) the setting bed specification was defective; and (iii) the amended specification did not create a satisfactory bond between the pavers and setting beds. The crosswalks and sidewalks could not withstand freeze-thaw cycles because the design did not include an air-entraining agent. Such agents prevent freeze-thaw damage within a rigid mass by incorporating tiny air bubbles. A liquid latex additive such as that originally specified by defendant SOM can act as an air-entraining agent to protect against freeze-thaw damage. While the setting bed specifications omitted any air-entraining agent, specifications for another part of the design, the concrete subslab, included entrained air. Perenchio also testified that without latex, a sand-cement setting bed would fail over time, regardless of whether the sand and cement were properly mixed and regardless of the amount of water used. Based on test results introduced into evidence, he concluded that the mall sidewalks would continue to fail in the future, even if broken and loose pavers were repaired. He testified further that the pavers specified were too large.

Another expert, landscape architect Gwen Cook, testified that defendant SOM failed to use reasonable care and skill in design because its specifications failed to provide for freeze-thaw cycles and because the pavers specified were too large for the crosswalks and sidewalks. Cook's employer participated in designing a replacement system for the sidewalks. The replacement system used small pavers in a herringbone pattern laid on a setting bed, consisting of manufactured sand only, over the existing concrete subslab. Cook testified the replacement system would have been less expensive to install initially and more durable than SOM's design.

### D. Liability and Damages Issues

Issues of liability and damages were tried separately. Liability issues were answered by the jury as follows:

1. Was the City damaged by SOM's failure, if any, to perform its services in conformity with the standard of reasonable care and skill of its profession with respect to specifying the size of the pavers in the First and Second Street crosswalks?

ANSWER: Yes.

2. Was the City damaged by SOM's failure, if any, to perform its services in conformity with the standard of reasonable care

and skill of its profession with respect to the design of the setting beds for the First and Second Street crosswalks?

ANSWER: Yes.

3. Was the City damaged by Weiss' material deviation, if any, from the plans and specifications with respect to the construction of the setting beds [for] the First and Second Street crosswalks?

ANSWER: No.

. . . .

5. Was the City damaged by SOM's failure, if any, to perform its services in conformity with the standard of reasonable care and skill of its profession with respect to specifying the size of the pavers in the remaining crosswalks?

ANSWER: Yes.

6. Was the City damaged by SOM's failure, if any, to perform its services in conformity with the standard of reasonable care and skill of its profession with respect to the design of the setting beds in the remaining crosswalks?

ANSWER: Yes.

7. Was the City damaged by Weiss' material deviation, if any, from the plans and specifications with respect to construction of the setting beds for the remaining crosswalks?

ANSWER: Yes.

8. If the answer to Issue 7 is "Yes," did the City, through its employees, have knowledge of and acquiesce in Weiss's material deviation from the plans and specifications with respect to construction of the remaining crosswalks?

ANSWER: Yes.

9. Was the City damaged by SOM's failure, if any, to perform its services in conformity with the standard of reasonable care and skill of its profession with respect to specifying the size of the pavers in the sidewalks?

ANSWER: Yes.

10. Was the City damaged by SOM's failure, if any, to perform its services in conformity with the standard of reasonable care and skill of its profession with respect to the design of setting beds for the Mall sidewalks?

ANSWER: Yes.

11. Was the City damaged by Weiss' material deviation, if any, from the plans and specifications with respect to construction of the setting beds for the Mall sidewalks?

ANSWER: No.

After rendering its verdicts as to liability, the jury heard arguments and instructions on damages. Damage issues and answers included the following:

1. What amount is the City entitled to recover from SOM for damages to the Mall crosswalks?

ANSWER: $570,000.

2. What amount is the City entitled to recover from SOM for damages to the Mall sidewalks?

ANSWER: $2,127,000.

The trial judge granted defendant SOM's motion for new trial on damages issue Number 1 and denied its motions for judgment notwithstanding the verdict and new trial on all other issues.

II.

[1] Defendant SOM first contends the trial court erred by denying SOM's motions for directed verdict and judgment notwithstanding the verdict or for a new trial on the liability issues as to (i) the first two crosswalks and (ii) all the sidewalks. Defendant argues the jury's finding that defendant Weiss did not materially deviate from SOM's specifications was improper as a matter of law. We disagree.

Defendant's motions for directed verdict and for judgment notwithstanding the verdict present the same question for review, namely, whether the evidence taken in the light most favorable to plaintiff was sufficient to entitle the plaintiff to have a jury pass on it. *Summey v. Cauthen*, 283 N.C. 640, 648, 197 S.E.2d 549, 554 (1973). All the evidence which supports the claim of the

party opposing the motion must be taken as true and considered in the light most favorable to him, giving him the benefit of every reasonable inference which may legitimately be drawn therefrom, and with contradictions, conflicts and inconsistencies being resolved in his favor. *Penley v. Penley*, 314 N.C. 1, 11, 332 S.E.2d 51, 57 (1985).

Plaintiff's evidence showed defendant SOM's letter of 14 May 1984 controlled the setting beds for the first two crosswalks and the sidewalks. The amended specifications as to water indicated "sufficient water added to the mix to permit the bed to be screeded and trowelled as necessary" and "sufficient quantity of water to bring the setting bed materials to the proper consistency for placing the pavers." In addition, the letter indicated that completely dry sand-cement mix incapable of being screeded did not meet the specifications. Evidence showed that in preparing the first two crosswalk setting beds, defendant Weiss judged that inherent moisture in the sand was sufficient, and these two setting beds were in fact screeded and trowelled. Thus all the evidence, viewed most favorably for plaintiff, permitted the inference that with respect to the two crosswalks, defendant Weiss did not materially deviate from the new specifications.

With respect to the sidewalk setting beds, evidence showed defendant Weiss again judged that inherent moisture in the sand was sufficient. Although evidence showed that at a later date some sand and cement were not thoroughly mixed, other evidence showed rainwater could enter the beds through the paver joints and that cementitious material tends to float. Additional evidence showed freeze-thaw cycles could affect the beds, and there had been at least one such cycle. Resolving inconsistencies in plaintiff's favor and giving plaintiff the benefit of every inference, separation of sand and cement was not shown until sometime after defendant Weiss had left the mall and may have derived from natural causes. We conclude that viewed in the light most favorable to plaintiff, the evidence would suggest a finding that defendant Weiss did not materially deviate from the 14 May 1984 specifications with respect to the sidewalk setting beds.

[2] Defendant SOM also contends that a material deviation by defendant Weiss would have completely insulated defendant SOM from liability for defective specifications. We disagree, for in our view North Carolina law does not support such a holding.

CITY OF CHARLOTTE v. SKIDMORE, OWINGS AND MERRILL

[103 N.C. App. 667 (1991)]

This Court has enunciated the following rules of contractor liability:

[W]here a contractor is required to and does comply with the plans and specifications prepared by the owner or the owner's architect, the contractor will not be liable for the consequences of defects in the plans and specifications. . . .

Where the contractor does not comply with the plans and specifications provided by the owner, notwithstanding the fact that they are defective, the contractor proceeds at his peril, assuming the risk of any deviations from the plans and guaranteeing the suitability of the work.

*Bd. of Education v. Construction Corp.*, 50 N.C. App. 238, 241-42, 273 S.E.2d 504, 507 (citations omitted), *disc. rev. improvidently granted*, 304 N.C. 187, 282 S.E.2d 778 (1981). However, the Court went on to say that damages for injury following a breach in the usual course of events are always recoverable, provided plaintiff proves such injury actually occurred as a result of the breach. Thus where defendants contended and produced evidence that plaintiff's damages were caused solely by defective designs of the architect, the trial court properly required defendants to carry the burden of proof on the question of causation. *Id.* at 242, 273 S.E.2d at 507.

The basis for the rule holding contractors liable for failure to follow plans and specifications "is that, absent an agreement to the contrary, there is an implied warranty by the owner that the plans and specifications are suitable for the particular purpose, and that if they are complied with[,] the completed work will be adequate to accomplish the intended purpose." *Gilbert Engineering Co. v. City of Asheville*, 74 N.C. App. 350, 362-63, 328 S.E.2d 849, 857, *disc. rev. denied*, 314 N.C. 329, 333 S.E.2d 485 (1985). In an action against an owner for breach of an implied warranty, as in any action for damages, proof of causation is essential. The burden of proof is on the contractor to prove that (i) the plans and specifications were adhered to, (ii) they were defective, and (iii) the defects were the proximate cause of the deficiency in the completed work. *Id.*

Under Illinois law cited by defendant SOM, a deviating contractor is "liable for whatever may subsequently happen to the structure, without resort to any formal proof of causation if the deviation

was 'material.' " This rule "denies the contractor even the ability to offer an affirmative defense that the damage was caused by something other than his deviation." *Havens Steel Co. v. Randolph Engineering Co.*, 613 F. Supp. 514, 529 (W.D. Mo. 1985) (citing *Clark v. Pope*, 70 Ill. 128 (1873)), *aff'd*, 813 F.2d 186 (8th Cir. 1987). However under North Carolina law, proof of a contractor's deviation simply creates a *prima facie* case as to causation, which a contractor may rebut by proving that the damage was not in fact caused by the deviation. *Bd. of Education v. Construction Corp.*, 50 N.C. App. at 242, 273 S.E.2d at 507. *See also Havens Steel Co. v. Randolph Engineering Co.*, 613 F. Supp. at 529.

Defendant SOM does not cite and we are aware of no case which holds that where an owner sues both architect and contractor, proof of material deviation by the contractor insulates the architect from liability for defects in plans and specifications. Instead, in such a case in North Carolina, upon the owner's showing that the contractor materially deviated from the specifications, the burden of proof as to causation would shift to the contractor. If evidence showed his deviation did not cause any damage, the jury could find no liability as to the contractor.

[3]  Defendant SOM next argues that the trial court erred by submitting damage issue Number 1, which dealt with the crosswalks, to the jury and by denying SOM's motion for judgment notwithstanding the verdict on this damage issue. Defendant SOM argues the jury's findings that plaintiff (i) was damaged by and (ii) acquiesced in defendant Weiss's material deviation from the specifications for the crosswalk setting beds for nine of the crosswalks absolved SOM of any liability for them as a matter of law. We do not agree.

As shown above, plaintiff's experts testified defendant SOM's design for the mall was defective in two separate respects, (i) the pavers and (ii) the setting beds. As to the pavers in all the crosswalks, there was no issue of material deviation by defendant Weiss. With respect to the setting beds only, the jury found plaintiff was damaged by defendant Weiss' material deviation from the specifications for nine of the crosswalks and that plaintiff acquiesced in Weiss' actions.

Defendant SOM's argument is premised on the same theory that we rejected in overruling its contention that a directed verdict should have been entered in its favor, namely, that any deviation

from the specifications by the contractor insulates the architect from liability and makes damages purely speculative. The jury, however, found that plaintiff was damaged by both SOM's defective contract specifications and Weiss' deviation. The fact that plaintiff's acquiescence in the deviation bars its recovery from defendant Weiss does not bar plaintiff's recovery from defendant SOM or absolve SOM from paying any portion of the recovery notwithstanding SOM's liability. As the trial court realized subsequent to trial, the jury instructions on the extent of defendant SOM's liability were not adequate to guide the jury in making distinctions with respect to damages for the setting beds and the pavers and as between the First and Second Street crosswalks and the remaining crosswalks. The trial court accordingly properly granted a new trial on damages issue Number 1 and denied defendant SOM's motion for judgment notwithstanding the verdict.

[4] Defendant's next contention is that the court erred in its instruction to the jury on the measure of damages for the sidewalks, damages issue Number 2. We disagree.

Discussing the principles of measuring damages, the North Carolina Supreme Court has said

"The fundamental principle which underlies the decisions regarding the measure of damages for defects or omissions in the performance of a . . . construction contract is that a party is entitled to have what he contracts for or its equivalent. What the equivalent is depends upon the circumstances of the case. . . . [W]here the defects are such that they may be remedied without the destruction of any substantial part of the benefit which the owner's property has received by reason of the contractor's work, the equivalent to which the owner is entitled is the cost of making the work conform to the contract. But where, in order to conform the work to the contract requirements, a substantial part of what has been done must be undone . . . the [owner] is not permitted to recover the cost of making the change, but may recover the difference in value." 9 Am. Jur., Building and Construction Contracts, sec. 152, p. 89; *Twitty v. McGuire*, 7 N.C. [(3 Mur).] 501, 504 [(1819)]. The difference referred to is the difference between the value of the [structure] contracted for and the value of the [structure] built—the values to be determined as of the date of tender or delivery of possession to the owner.

*Robbins v. Trading Post, Inc.*, 251 N.C. 663, 666, 111 S.E.2d 884, 887 (1960).

"Our courts have adhered to the general rule that the cost of repair is the proper measure of damages unless repair would require that a substantial portion of the work completed be destroyed." *Kenney v. Medlin Construction & Realty*, 68 N.C. App. 339, 344, 315 S.E.2d 311, 314, *disc. rev. denied*, 312 N.C. 83, 321 S.E.2d 896 (1984). Where such destruction is required, a different measure of damages, the diminution in value measure, may be used. However, the value measure is to be used only where the structure substantially conforms to the contract specifications and only a minor defect exists which does not substantially lower the value of the structure. *Id.*

In *Kenney*, defendant agreed to build a house for plaintiff at a cost of $50,625.00. Plaintiff sued after moving in and observing numerous structural problems with the house. At trial, plaintiff's expert witnesses testified that due to various structural problems the house did not meet standards of workmanlike quality. One expert testified that to remedy the problems, he would need to tear down the house to the footing at a cost of at least $35,000.00. Another expert testified that determining the extent of the damage would require stripping the house down to its frame and foundation at a cost of between $50,000.00 and $60,000.00. *Id.* at 340-41, 315 S.E.2d at 312-13.

On appeal defendant contended the trial court had erred by instructing the jury to measure plaintiff's damages by the amount required to bring subject property into compliance with the implied warranty. *Id.* at 343, 315 S.E.2d at 314. This Court held the trial court had not erred, stating, "We do not find the cost of repair awarded plaintiff to be disproportionately high as compared to the loss in value without such repair." *Id.* at 345, 315 S.E.2d at 315.

The cost of completion or repair rule is generally preferred: "Th[is] rule is applied in cases where the landowner will not get substantially what he bargained for unless he in fact gets the repair, replacement or completion." D. Dobbs, *Handbook of the Law of Remedies* § 12.21 (1973). Moreover,

> The policies in support of the value measure of damages arise only when the contractor has substantially performed, so that the building he furnishes will function substantially

as the landowner bargained for. In such a case the breach does not seriously impede the landowner's purpose. Where such a case occurs and it is also a case where completion or repair will be inordinately expensive, the policy against economic waste suggests use of the value formula rather than the cost formula. But it is not economic waste alone that triggers this approach; it is economic waste plus substantial performance.

*Id.* § 12.21 at 899. Or, as restated by this Court, "When defects or omissions in construction are so major that the building does not substantially conform to the contract, then the decreased value of the building constructed justifies the high cost of repair." *Kenney v. Medlin Construction & Realty*, 68 N.C. App. at 345, 315 S.E.2d at 315. *See also* Restatement (Second) of Contracts § 348 comment c (1981) (if performance is defective, it may not be possible to prove the loss in value with reasonable certainty, but the injured party can usually recover damages based on cost to remedy defects even if this gives a recovery in excess of the loss in value to him).

This Court has found error where the trial court failed to instruct as to both measures of damages. *E.g., Stiles v. Charles M. Morgan Co.*, 64 N.C. App. 328, 307 S.E.2d 409 (1983) (purchase price of newly constructed house was $51,500.00 but total cost of correcting defects was only $5,570.67; *Warfield v. Hicks*, 91 N.C. App. 1, 370 S.E.2d 689 (where cost of house was $214,837.54 but appraisal of defective conditions showed a lessening in value of only $35,000.00, jury should have been allowed to determine which measure of damages was appropriate), *disc. rev. denied*, 323 N.C. 629, 374 S.E.2d 602 (1988). *Cf. Lagasse v. Gardner*, 60 N.C. App. 165, 298 S.E.2d 393 (1982) (where defendant did not attempt to show alleged defects could be remedied without substantial destruction of house but plaintiff's evidence showed the contrary, court should have determined if defects could be readily remedied without substantial destruction and if a substantial part of what had been done must be undone). Where it is unclear whether only a minor repair is involved or whether substantial undoing "resulting in economic waste," *Warfield v. Hicks*, 91 N.C. App. at 11, 370 S.E.2d at 695, will be required, the factfinder must determine which measure of damages is appropriate. By contrast, where it is clear that substantial undoing is needed but plaintiff will not receive the benefit of his bargain without such undoing or that substantial undoing is not required, a trial court may properly instruct as

to the cost measure only. *See Kenney v. Medlin Construction & Realty*, 68 N.C. App. at 345-46, 315 S.E.2d at 315; *Board of Education v. Construction Corp.*, 64 N.C. App. 158, 306 S.E.2d 557 (1983) (where no evidence showed repairing roof would require substantial destruction of school, cost of repair was proper measure of damages), *disc. rev. denied*, 310 N.C. 152, 311 S.E.2d 290 (1984).

In the case under review, the instruction as to damages issue Number 2 read in pertinent part:

> Now, you have found that the City has suffered damages to the sidewalks as a proximate result of SOM'S failure to use reasonable care and diligence in specifying the pavers and designing the setting beds for the Mall's sidewalks.
>
> Therefore, the City is entitled to recover the reasonable cost of replacement of or repair to the Mall's sidewalks less salvage value, if any, of the parts replaced.
>
> So, I instruct you on this issue, you should award the City damages in such amount as you find by the greater weight of the evidence represents the reasonable cost of repairing or replacing the damaged Mall's sidewalks less the salvage value, if any, of the parts replaced.

Plaintiff's evidence showed the sidewalks would fail and continue to fail because their setting beds were defective. To correct this defect, it would be necessary to remove all the pavers and the granite curbing and install new setting beds, curbing, and pavers. The evidence also showed, however, that the sidewalk was only a part of the eight million dollar transit mall improvement. Replacement of the sidewalk would result in loss of some materials in the sidewalk such as the eighteen-inch square pavers and the granite curbing, but the concrete subslab, a high cost item, would remain intact. Furthermore, the remainder of the improvements, the lights, the kiosks, the benches and the street pavement, would be protected and undisturbed. (As shown above, at the time of trial the crosswalks had already been replaced.)

Applying the principles set out above to these facts, we are unable to say the trial court erred in instructing as it did. The defects were not minor, and the sidewalks did not conform to the contract. Moreover, although a substantial amount of the work on the sidewalks would have to be destroyed, replacement of the sidewalk would not result in economic waste to the mall project.

Under *Kenney*, the evidence did not support an instruction on the value measure of damages. We also note that although plaintiff's evidence showed the replacement cost to be $2,577,000.00 and that plaintiff had incurred additional costs of $79,191.82 for sidewalk replacement design and $34,497.00 for testing of the defective walks, the jury awarded plaintiff only $2,127,000.00. We, therefore, conclude that the trial court did not err in instructing the jury on this issue.

Defendant SOM also argues it is entitled to a new trial on all issues. We disagree. "It is 'within the discretion of this Court whether to grant a new trial on one issue. A new trial as to damages only should be ordered if the damage issue is separate and distinct from the other issues and the new trial can be had without danger of complication with other matters in the case." *Fortune v. First Union Nat. Bank*, 323 N.C. 146, 151, 371 S.E.2d 483, 486 (1988). In the instant case, as in *Fortune*, the liability and damages issues as to the mall sidewalks were distinct from each other and from other liability and damages issues. The trial court bifurcated jury deliberations on liability and damages, and the jury heard arguments and instructions on damages only after it rendered its liability verdict. There was no compromise verdict. The trial court did not err in denying defendant SOM's motion for new trial on the liability issues.

We have already addressed defendant SOM's final contention concerning measurable value of the sidewalks in our holding on the jury instruction as to measure of damages.

### III. Plaintiff's Appeal

Plaintiff's sole contention on appeal is that the trial court erred in allowing defendant SOM's motion for a new trial on damages issue Number 1. This issue has been resolved in our resolution of defendant SOM's appeal.

Affirmed as to award of new trial on damages issue Number 1; no error as to liability or damages issue Number 2.

Judges ARNOLD and EAGLES concur.