Heron Bay Acquisition, LLC v. United Metal Finishing, Inc., 2014 NCBC 15.

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
12 CVS 5505

HERON BAY ACQUISITION, LLC, )
)
      Plaintiff, )
)
    v. )
)
UNITED METAL FINISHING, )
INC., CLAUDE T. CHURCH and )
CATHERINE H. CHURCH, )
)
      Defendants. )
)

**ORDER**

{1}    THIS MATTER is before the court on cross-motions for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)").  For the reasons stated below, Plaintiff's motion is DENIED and Defendants' motion is GRANTED in part and DENIED in part.

> *Blanco Tackabery & Matamoros, P.A. by Peter J. Juran and Toni J. Grace for Plaintiff Heron Bay Acquisition, LLC.*

> *Tuggle Duggins, P.A. by Denis E. Jacobson, Jeffrey S. Southerland, and Sarah J. Hayward for Defendants.*

Gale, Judge.

## I.  PROCEDURAL HISTORY

{2}    Plaintiff Heron Bay Acquisition, LLC ("Heron Bay") initiated this lawsuit on April 16, 2012.  The matter was designated a Complex Business Case by Chief Justice Sarah Parker on April 18, 2012, and assigned to the undersigned on April 25, 2012.

{3}    The action arises out of agreements by which Plaintiff contracted to purchase Defendants' business and the real estate upon which it is located.  Defendants terminated the agreements prior to closing.  Plaintiff sues for damages

related to the termination, but does not seek specific performance. Plaintiff filed an Amended Complaint on October 24, 2013, bringing claims for: (1) breach of the Asset Purchase Agreement; (2) breach of the Real Estate Contract; (3) breach of the covenant of good faith and fair dealing; and (4) unfair and deceptive trade practices. Defendants answered the Amended Complaint on November 25, 2013.

{4} Plaintiff and Defendants filed cross-motions for summary judgment ("the Motions") on December 2, 2013. The Motions have been fully briefed, the court heard oral argument on February 20, 2014, and the matter is ripe for disposition.[1]

## II. PARTIES

{5} Plaintiff Heron Bay is an Ohio limited liability company created to acquire companies which maintains its principal place of business in Uniontown, Ohio. (Am. Compl. ¶ 1; Answer ¶ 1.) Scott Lowrie ("Lowrie"), an Ohio citizen, owns Heron Bay. (Am. Compl. ¶ 1; Answer ¶ 1.)

{6} Defendant United Metal Finishing, Inc. of Greensboro ("UMF") is a North Carolina corporation located in Greensboro, North Carolina. (Am. Compl. ¶ 2.) Defendants Claude Church ("Church") and Catherine Church (collectively "the Churches") own the land on which UMF operates. (Am. Compl. ¶ 4; Answer ¶ 4.) Church is UMF's sole shareholder. (Am. Compl. ¶3; Answer ¶ 3.)

## III.    FACT STATMENT[2]

{7} UMF is in the business of electro-plating and anodizing metal, which involves chemicals and materials that coat metal products. (Am. Compl. ¶ 6; Answer ¶ 6.) In 2009, the Churches began to explore selling UMF and the accompanying real property ("the Property"). Late that year, Heron Bay learned

---

[1] A related case, *Paradigm Financial Group, Inc. v. Church*, No. 12-CVS-357 (Surry County) (N.C. Super. Ct.) (herein after "the *Paradigm* case") was also designated as a complex business case and assigned to this court. The court heard motions for summary judgment in that case on the same day. The court issues a separate order on those motions.

[2] Unless otherwise noted, these facts are uncontested and are established by the record submitted. The court does not make findings of fact when ruling upon a motion for summary judgment. *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975).

that UMF and the Property were for sale, and Lowrie, representing Heron Bay, signed a Confidentiality and Warranty Agreement to begin negotiations with UMF's broker, Paradigm Financial Group, Inc. ("Paradigm"), to purchase the business and the Property. (Br. Supp. Pl. Mot. Summ. J. ("Pl. Supp. Br.") Ex. 98; Am. Compl. ¶ 8; Lowrie Aff. ¶ 4; Lowrie Dep. vol. I 10:15–20:30, Apr. 25, 2013.) A few months later, Church received a demand from the Guilford County Department of Public Health to remediate contamination at UMF and the Property after a report from ECS Carolinas, LLP ("ECS"), an environmental consulting firm, revealed the extent of contamination on the Property. (Pl. Supp. Br. Exhibit 64; Claude T. Church Dep. vol I. 91:8–20, 100:18–101:25, Mar. 8, 2013.) Upon learning of this contamination, Lowrie ceased negotiating UMF's purchase. (Lowrie Aff. ¶ 6.)

{8} Heron Bay resumed negotiations in November 2010 when it learned that UMF had retained ECS and an environmental attorney, George House ("House"), to assist in remediating the contamination. (Lowrie Aff. ¶¶ 8–9.) Church and House informed Lowrie that the North Carolina Department of Environment and Natural Resources ("DENR") had a program designed to encourage buyers to purchase contaminated property by cutting off the buyer's liability for past contamination ("the Brownfield Program"). Essentially, the buyer of contaminated land enters into a contract with DENR ("Brownfield Agreement") which absolves the buyer of liability to the State for historic contamination. (Eckard Dep. 36:7–24.) Before entering a Brownfield Agreement, the buyer conducts testing on the land to determine a baseline for existing contaminants at the time of purchase. (Eckard Dep. 34:8–25.) On average, it takes approximately eighteen to twenty-four (18–24) months from preliminary approval of a Brownfield Application to finalize a Brownfield Agreement. (Eckard Dep. 85:7–10.) The shortest Brownfield Process of of which DENR representative, Sharon Eckard ("Eckard"), is aware took twelve (12) months to complete, and even then the purchaser was still performing his obligations under the Brownfield Agreement at the time of her deposition. (Eckard Dep. 30:16–31:4.)

{9}     On March 9, 2011, DENR conditionally approved Heron Bay's Brownfield Application.  (Pl. Supp. Br. Ex. 125; Lowrie Aff. ¶ 12; Eckard Dep. 54:2–56:2.)  Heron Bay, UMF, and the Churches then entered into formal contracts for the purchase of UMF ("the Asset Purchase Agreement" or "APA") and the Property ("the Real Estate Contract" or "RPA") (collectively, "the Purchase Agreements").  (Pl. Supp. Br. Ex. 18 ("RPA"), Ex. 20 ("APA").)  Among other things, the Purchase Agreements included certain representations and undertakings, including: (1) representations as to the Property's environmental condition and UMF's ongoing operations; (2) assurances regarding customer and supplier contracts; (3) giving Heron Bay exclusive rights to purchase UMF by preventing Church from shopping the company around to other interested purchasers; and (4) subject to certain conditions, giving either party the right to terminate the Purchase Agreements following November 1, 2011, less than nine months after Heron Bay's Brownfield Application had received preliminary approval.

A.  Environmental Representations

{10}    Although Heron Bay was obviously aware of environmental issues from past operations when entering the Purchase Agreements, UMF and the Churches made representations and undertook indemnity obligations in the Purchase Agreements to protect Heron Bay's post-acquisition liabilities.  Specifically, UMF represented that: (1) no hazardous materials were used in the business; (2) no hazardous materials were released on the Property; (3) UMF was in compliance with all relevant environmental laws; (4) Defendants would comply with all relevant environmental laws going forward; (5) Defendants knew of no liabilities resulting from environmental violations; (6) all UMF equipment was in good repair; and (7) Defendants were not aware of any previous events which would have a material adverse effect on the business. (RPA §§ 6.1.2, 6.1.6, 10.2; APA §§ 3.1.29, 3.1.23(a), (d)–(g), 3.1.9, 3.1.12(g), 3.1.15, 3.1.14.)  Defendants promised to indemnify Plaintiff for any liability resulting from Defendants' failures to comply with these representations.  (APA § 6.1(c); RPA § 12(i).)

{11}   Any remedy for inaccurate representations was limited by the "Environmental Exceptions" listed in the APA and RPA, which provide that Defendants would indemnify Heron Bay for any liability it incurred as a result of environmental breaches for which Heron Bay would not receive Brownfield immunity. (APA, Schedule 3.1.23; RPA, Ex. E.)

{12}   Heron Bay contends that the Churches learned from ECS and House that UMF equipment and operations were broken, in need of repair, historically leaked contaminants onto the Property, and continued to pollute the Property.[3] (Pl. Supp. Br. 11.) Once documented, DENR required Defendants to remediate the potential release of pollutants from underground piping, (Eckard Dep. 135:1–23,) by renovating a concrete floor on the Property to lower the risk of future releases and by remediating the soil below the concrete.[4] (Eckard Dep. 136:31–138:3.)

{13}   ECS was requested to do further testing to set a baseline for any Brownfield Agreement. ECS's subsequent testing revealed that the existing contamination was more extensive than its former reports indicated. Specifically, the groundwater test revealed that Nickel was at 16,000 mpl (the legal limit is 100), and Chromium was as high as 47,000 mpl (the legal limit is 10). (Pl. Supp. Br. Ex. 147, Eckard Dep. 230:4–20.) The Parties dispute whether these elevated results indicate that UMF continued to contaminate the Property, or whether previous testing did not include enough statistical data for an accurate sampling and that the more extensive documented level of contamination resulted from the wider array of data samples.

## B. Representations Regarding Customer and Supplier Contracts

{14}   The APA represents that "[n]either [UMF] nor [Church] knows, or has any reasonable grounds to know, that any such customer or supplier or any material distributor has terminated or expects to terminate a portion of its normal business with [UMF], as a result of the transactions contemplated in this

---

[3] In support, Plaintiff cites three pages of deposition testimony that it did not include in the record.
[4] Section III(E) provides a more detailed discussion of the subsequent remediation.

Agreement or otherwise." (APA § 3.1.25.) Church testified that the "determining factor" in his decision to terminate the Purchase Agreements was that UMF's "biggest customer," Grass America, expressed serious concern about the change in UMF's ownership. (Claude T. Church Dep. 68:9–70:2, Sept. 24, 2013.) The record suggests that on several occasions a representative from Grass America asked Church's employees how the change in UMF's control would affect its business relationship with the company. (Claude T. Church Dep. 69:17–70:21, Sept. 24, 2013.) Church did not advise Heron Bay of Grass America's concern. (Claude T. Church Dep. 70:24–71:9, Sept. 24, 2013.)

### C. Post-Agreement New Equipment Purchases

{15}    Plaintiff's initial brief provides a list of the Purchase Agreements sections that Defendants allegedly violated, including APA Sections 3.1.12(g), 3.1.19, 3.1.29, and 4.1.2, (Pl. Supp. Br. 10–11,) which contain future assurances that: (1) Defendants will continue to disclose any material adverse effect on UMF and will not themselves cause any adverse effect; (2) Defendants will continue to disclose all agreements to which UMF is a party; and (3) the updated disclosures UMF submits to Heron Bay will not have omissions. (Pl. Supp. Br. 10–11.) In its Reply Brief, Plaintiff contends, for the first time, that UMF violated those provisions by purchasing new equipment without Heron Bay's permission. (Pl. Supp. Br. Ex. 64; Pl.'s Reply Br. Supp. Mot. Summ. J. ("Pl. Reply Br.") 3.)

### D. No-Shop Agreement

{16}    The APA prohibits Church from negotiating with another for the sale and purchase of the business and real estate during the term of the agreements with Heron Bay. A few months after signing the Purchase Agreements, Church communicated with Pioneer Metal Finishing, LLC ("PMF") concerning the sale of UMF. (Pl. Supp. Br. Ex. 74–77.) In addition, Church hosted a site visit from Steve King, a representative from PMF. (Pl. Supp. Br. Ex. 79.) PMF representatives concluded that Church was "very interested in [PMF] pursuing an offer[]" and that

UMF could "get out of [its Heron Bay] contract for 25-50k". (Pl. Supp. Br. Ex. 79; *see also*, Pyle Dep. 48:12–49:8, 51:2–12 (testifying that Church was pursuing discussions with PMF regarding UMF's sale while under contract with Heron Bay).)[5] There is no evidence that Church disclosed UMF's financial information to PMF until after he terminated the Purchase Agreements.

{17}  After November 1, 2011, the date on which the APA afforded either party the right to terminate, (APA § 8.1(a),) but before Defendants later terminated the Purchase Agreements, a PMF representative emailed Church's accountant, Ronall Davis ("Davis"), asking for financial information which Church had previously denied him. (Pl. Supp. Br. Ex. 81 (email to Davis which reads, "[Church] indicated his agreement with his prospective buyer has expired or at least triggered the option for [Church] to terminate the agreement. We agreed he would call you to provide us with information for a [sic] evaluation.").) Church did not inform Heron Bay of PMF's interest in and discussion with UMF. (Lowrie Aff. ¶ 39.)

{18}  Before Defendants terminated the Purchase Agreements, Davis also met and communicated with an attorney, Jessica Cox ("Cox"), who represented another potential purchaser, George Harrison ("Harrison"). (Cox Dep. 15:15–22.) On January 23, 2012, Davis and Cox met to discuss the purchase of UMF and on February 1, 2012, Cox sent Church a Letter of Intent, which detailed Harrison's offer to purchase UMF. (Pl. Supp. Br. Ex. 308.) Davis went over UMF's financial data with Harrison.[6] (Davis Dep. 168:16–25.) Church met with Harrison's agents and considered his offer to purchase without informing Heron Bay. (Cox Dep. 15:15–22, 16:19–23.)

---

[5] Heron Bay incorporates the discussion of all No-Shop violations in briefs filed the *Paradigm* case, to which this deposition, and several others, were attached.

[6] Church testified that any information Davis shared with Cox and Harrison would have been contrary to Church's express instructions. (Claude T. Church Dep. vol. II 361:1–14, July 24, 2013.) Davis testified that he went over the financials with Harrison at Church's instruction. (Davis Dep. 168:16–25.)

## E. UMF's Alleged "Improper" Remediation

{19}    Upon receiving ECS's 2011 report regarding contamination on the Property and within UMF operations, Lowrie met with Church to discuss the remediation Defendants would need to undertake to consummate the transaction. (Lowrie Aff. ¶ 24.)  Lowrie contends remediation required an independent expert. (Lowrie Aff. ¶ 24.)  Church instead had his own maintenance man undertake the remediation.  (Lowrie Aff. ¶ 26.)  UMF undertook to reline the sumps, change the piping, and use an epoxy floor sealant.  (Claude T. Church Dep. 37:7–11, Sept. 24, 2013.)  When he discovered that Church had utilized a UMF employee to remove the concrete floor, Lowrie advised Church that the contaminated floor should be disposed of according to environmental regulations.  (Lowrie Aff. ¶ 27.)  Heron Bay contends the remediation was substandard and in violation of APA Section 3.1.23, which provides that Defendants would make reasonable industry standard repairs and renovations to UMF equipment and operations prior to closing.  (APA § 3.1.23.)  Church does not recall whether he notified DENR or Guilford County Department of Public Health of these remediation efforts.

## F. Defendants' Termination

{20}    Various communications between November 1, 2011 and Defendants' later termination are reflected in Exhibits 167 through 175, which Plaintiff contends collectively show that Defendants elected to waive their right to terminate after November 1, 2011.  Defendants gave oral notice of their intent to terminate the Purchase Agreements pursuant to APA Section 8.1(a)(iv) during a November 2, 2011 telephone conference between their attorney ("Stanaland") and Lowrie.  (Pl. Br. Opp'n Defs.' Mot. Summ. J. ("Pl. Opp'n Br.") Ex. 168, ¶ 1.)  Two days later, Defendants indicated they would defer termination and asked Lowrie to articulate the steps he believed Defendants should take to satisfy the Purchase Agreements' conditions.  (Pl. Supp. Br. Ex. 167.)  Exhibit 169 is an email from Stanaland to Lowrie on November 8, 2011, affirming that Lowrie was permitted to resume direct

contact with Church and to visit the facilities, and that there was no impediment to Church sending financial information Lowrie requested. (Pl. Opp'n Br. Ex. 169.) On or around November 10, 2011, Lowrie advised Stanaland of UMF's noncompliance issues, to which Stanaland responded with a summary of Defendants' concerns about Heron Bay's failure to satisfy the Purchase Agreements' terms. (Br. Opp'n to Defs.' Mot. Summ. J. ("Pl. Opp'n Br.") Ex. 170 and 171.) On November 18, 2011, Lowrie sent Stanaland an email stating that UMF would be required to remediate certain ground contamination and any ongoing release of contaminants from UMF operations. (Pl. Opp'n Br. Ex. 175.) Each of the Parties indicated that the other would be required to undertake certain activities after DENR released its draft of a Brownfield Agreement. (Pl. Opp'n Br. Ex. 174.)

{21}    On February 17, 2012, Defendants terminated the Purchase Agreements in writing. (Lowrie Dep. vol. II 397:1–8, Apr. 26, 2013; vol. III 464:11–17, May 15, 2013.)

## G. Defendants' Alleged Improper Post-Termination Use of Heron Bay's Brochure

{22}    As negotiations progressed, Heron Bay updated UMF's brochure and website to attract new customers in anticipation of closing the transaction and taking over UMF. (Lowrie Aff. ¶ 60.) Lowrie paid a photographer to shoot pictures around the Property and drafted the text of the brochure. (Lowrie Aff. ¶ 60.) Heron Bay contends that after terminating the Purchase Agreements, Defendants misappropriated Plaintiff's brochure and used it in the marketplace for their own personal gain. (Lowrie Aff. ¶ 60.)

## IV. LEGAL STANDARD

{23}    Summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law. N.C. R. Civ. P. 56(c); *Andresen v. Progress Energy, Inc.*, 204 N.C. App. 182, 184, 696 S.E.2d 159, 160–61 (2010).

## V. ANALYSIS

### A. Plaintiff's Contract Claims

{24}  Plaintiff complains that Defendants breached several provisions of the APA and RPA, and subsequently wrongfully terminated the Purchase Agreements under APA Section 8.1(a)(iv).  While Plaintiff does not seek specific performance, it contends that Defendants improperly terminated the contract because of Defendants' own breaches of the Purchase Agreements, thereby triggering liability for wrongful termination.  The claims require the court first to examine whether Defendants had the right to terminate after November 1, 2011, and if they did, whether they did so in a manner or for reasons which expose them to liability for wrongful termination, and how any liability is to be measured in light of the remedy provisions of the Purchase Agreements.

#### 1. Defendants Had the Right to Terminate the Purchase Agreements; but Material Fact Issues Remain as to Whether Plaintiff May Recover Damages for the Termination

{25}  The court concludes that the uncontested facts establish that Defendants had the right to terminate the Purchase Agreements on February 17, 2012, and did not waive that right after November 1, 2011.  The court finds without merit Plaintiff's alternative arguments that: (1) Section 8.1(a)(iv) was only a "check date" that gave Defendants a right to terminate the contract on November 1, 2011, which expired if not exercised on that date; (2) even if the right to terminate extended beyond November 1, 2011, a party could not exercise it while in substantial breach; and (3) Defendants waived or are otherwise equitably estopped from exercising any right to terminate they retained after November 1, 2011.

{26}  Analysis begins with the contractual provision.  APA Section 8.1 provides, in relevant part:

> (a) Anything herein or elsewhere to the contrary notwithstanding, this Agreement may be terminated by written notice of termination at any time before the Closing Date only as follows . . . (iv) by either [Heron

Bay] or [UMF] if the transactions contemplated hereby have not been consummated by November 1, 2011.

. . .

(b)    If this Agreement is terminated as permitted by Section 8.1(a) hereof, such termination shall be without liability of any party . . . to any other party to this Agreement provided however, that *if such termination shall result from the willful failure of any party to fulfill a condition to the performance of the obligations of any other party or to perform a covenant of this Agreement or from a willful breach by any party to this Agreement*, such party shall be fully liable for any and all losses, costs, claims, or expenses, incurred or suffered by the other parties as a result of such failure or breach.

(APA § 8.1 (emphasis added).)

### i.  November 1, 2011 Was Not Only a "Check Date"

{27}    Plaintiff argues that APA Section 8(a)(iv) "was not intended to by [sic] used by any party in the manner it is asserted by UMF or Claude Church as set forth in the Termination Letter." (Pl. Supp. Br. 21.) Rather, Plaintiff contends, the provision was drafted to provide only a way to terminate the transaction if it was stalled as of November 1, 2011. (Pl. Supp. Br. 21.) Because it was just a "check date," Plaintiff contends that negotiations and efforts toward closing after November 1, 2011 evidence an intent to proceed to closing with no further threat of termination.

{28}    Defendants argue and the court agrees that this interpretation has no evidentiary support and contradicts the APA's clear language. (Defs.' Resp. Br. Opp'n Pl. Mot. Summ. J. ("Defs. Opp'n Br.") 17.)

{29}    The Parties could have included express language to limit the termination right as Plaintiff contends. But they did not. Rather, they agreed that either party could terminate the Purchase Agreements "at any time before the Closing Date" (APA § 8.1(a),) "if the transactions contemplated . . . have not been consummated by November 1, 2011." (APA § 8.1(a)(iv).) It is undisputed that the sale had not been consummated on this date, and there is no evidence that the

Parties ever agreed to a contract modification expressly eliminating the termination right or extending the consummation date.

ii. The Right to Terminate Was Not Conditioned on the Absence of Any Substantial Breach

{30} Plaintiff alternatively contends that Defendants may not terminate the Purchase Agreements while in substantial breach. (Pl. Opp'n Br. 6.) Defendants respond that Plaintiff's interpretation again ignores the APA's plain language. (Reply Br. Supp. Defs.' Mot. Summ. J. ("Defs. Reply Br.") 4.)

{31} The court agrees with Defendants' position for the same reason it could not accept Plaintiff's invitation to view the termination provision as merely a check date. The Purchase Agreements specifically contemplate the possibility that one party might terminate for the very reason that it was in willful breach of a condition. It then provides the remedy that will follow for such a willful breach. (APA § 8.1(b).) The chosen language is plainly inconsistent with the argument that termination was conditioned on the absence of breach.

iii. The Evidence Does Not Support a Conclusion that Defendants Waived Their Right to Terminate

{32} Alternatively, Plaintiff contends that Defendants waived their termination right because UMF and Heron Bay continued to work towards closing after November 1, 2011 and did so because UMF expressed the intent to move forward. (Pl. Opp'n Br. 9–11.) Defendants respond both that the evidence does not support any argument that they renounced their right to terminate and moreover that the APA contains an explicit non-waiver provision requiring the party discharging the contractual right to do so in a signed writing. (Defs. Reply Br. 7; APA § 10.4.)

{33} A party seeking to show waiver of a contractual right must demonstrate that the waiving party intended to relinquish the benefit at issue, and manifested that intention either expressly or impliedly. *Fairview Devs., Inc. v.*

*Miller*, 187 N.C. App. 168, 172–73, 652 S.E.2d 365, 368 (2007). Courts disfavor implicit waiver of a contractual right. *Id.* at 173, 652 S.E.2d at 369.

{34} Plaintiff invites the court to infer Defendants' intent to waive their contractual termination right from those communications detailed in Section III(F) of this Order. Having studied those communications carefully, the court concludes that any inference to be drawn would be that Defendants reserved rather than waived their right to terminate.

{35} Defendants' willingness to continue toward a potential closing does not support the clear implication necessary under the case law to find a waiver of a clear and express contractual termination right.

{36} While the case law disfavoring waiver by implication might be alone dispositive, here the APA contains an express non-waiver provision. North Carolina courts have recognized and enforced similar provisions. *See, e.g., Long Drive Apartments v. Parker*, 107 N.C. App. 724, 729, 421 S.E.2d 631, 634 (1992) (noting that the contract between the parties clearly indicated that certain actions would not constitute waiver).

{37} The APA provides:

> The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right. . . . To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement can be discharged by one party . . . unless in writing signed by the other party entitled to the benefit of such claim or right; (b) no waiver that may be given by a party will be applicable except in the specific instance for which is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party[.]

(APA § 10.4.)

{38} Plaintiff has not identified any written, signed waiver of Defendants' right to terminate the Purchase Agreements pursuant to APA Section 8.1(a)(iv). It has not otherwise offered evidence adequate to overcome the APA's non-waiver

provision.   In sum, the court finds that the uncontested record defeats any claim that Defendants waived their contractual termination right.

### iv. Defendants Are Not Equitably Estopped from Exercising Their Termination Right

{39}   Even if Defendants did not waive the termination right, Plaintiff asserts that they are equitably estopped from exercising it because Heron Bay "spent innumerable hours working towards closing" in reasonable reliance on Defendants' representations that they would cure all material breaches prior to closing.  (Pl. Opp'n Br. 11.)

{40}   "[E]quitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity." *Woodring v. Swieter*, 180 N.C. App. 362, 374–75, 637 S.E.2d 269, 279–80 (2005) (quoting *Ellen v. A.C. Schultes of Md., Inc.*, 172 N.C. App. 317, 321, 615 S.E.2d 729, 732 (2005)).  Among other limitations, equitable estoppel is not properly invoked when the party seeking it has an adequate remedy at law.  *Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC v. Brewer*, 209 N.C. App. 369, 389, 391, 705 S.E.2d 757, 771–72 (2011) (holding equitable estoppel was inappropriate to create an operating agreement governing withdrawal after deadlock had arisen because there was an adequate remedy at law under N.C. Gen. Stat. § 57C-6-02 (2011)) (citing *Hawks v. Brindle*, 51 N.C. App. 19, 25, 275 S.E.2d 277, 282 (1981) (denying recovery on an equitable restitution claim where plaintiffs could recover under breach of covenant and had an adequate remedy at law)).

{41}   The court finds that the same evidence that is inadequate to demonstrate any waiver is also inadequate to create the factual basis of an equitable estoppel defense.  In addition to this lack of record evidence, the contract provides a legal remedy if the termination was for certain causes.  If Plaintiff is able to prove that Defendants' own willful breaches of the Purchase Agreements motivated their termination, the APA permits Plaintiff to recover damages it can

prove are related to those causes under APA Section 8.1(b). In this case, equitable estoppel is improper both for lack of an evidentiary record, and because the Purchase Agreements provide a remedy at law.

## 2. Breach of Contract Claims

{42} While Plaintiff's claims are more focused on Defendants' "wrongful" termination, Plaintiff also asserts additional breach of contract claims. To prevail on its claims for breach of contract, Plaintiff must demonstrate that: (1) valid contracts existed between the parties; (2) Defendants breached those terms; and (3) damages resulted from the breach. *Claggett v. Wake Forest Univ.*, 126 N.C. App. 602, 608, 486 S.E.2d 443, 446 (1997).

{43} Plaintiff recites a litany of nineteen provisions from the APA and five provisions from the RPA which it claims Defendants breached. (Pl. Supp. Br. 9–11.) Without the benefit of a more specific statement, the court has plodded through the cited sections. Having done so, the court concludes that many claims have no adequate factual support to proceed but that material issues of fact allow limited claims for breach to survive summary judgment.

### i. Plaintiff's Claims for Breach of Environmental Warranties and Representations Fail

{44} Plaintiff contends that Defendants knowingly misrepresented the existing condition of UMF and its liabilities at the time the APA and the RPA were signed,[7] and subsequent to their execution continued to leak harmful contaminants into the soil in violation of several of the Purchase Agreements' provisions.[8] More specifically, Plaintiff asserts misrepresentations regarding: (1) hazardous materials used in the business; (2) hazardous materials released on the property; (3) the Property's and UMF's compliance with all relevant environmental laws; (4) UMF's

---

[7] Plaintiff contends that Defendants made knowing environmental misrepresentations in APA §§ 3.1.9, 3.1.12(g), 3.1.14, 3.1.15, 3.1.19, 3.1.23 (a), (d)–(g), 3.1.25, 3.1.39, 4.1.1, 4.1.4, 4.1.6, and 4.1.7; and RPA §§ 6.1.2 and 6.1.6.

[8] Upon discovering what Plaintiff alleges was UMF's continued contamination, Plaintiff contends that it became aware that Defendants were also in breach of APA §§ 3.1.23(k) and 3.1.16, and RPA § 10.2.

promise to remain in compliance with all environmental laws; (5) UMF's liability for environmental violations; (6) the condition of UMF's equipment; and (7) the Churches' report that they were not aware of any occurrence which would have a material adverse effect on the business. (APA §§ 3.1.23(a), (d)–(g), 3.1.9, 3.1.12(g), 3.1.15, 3.1.14.) Based on ECS's later testing, Plaintiff claims it first discovered the extent of contamination on the Property, particularly at the property line, as well as indications that UMF's operations stood on contaminated lands or waters, (APA § 3.1.23(k),) that UMF had not kept the Property free of waste while each party prepared for closing, (RPA § 10.2,) and that UMF was subject to or threatened with litigation, (APA § 3.1.16.)

{45} Defendants respond that each of these environmental representations and warranties was limited by the identical exceptions delineated in both APA Schedule 3.1.23 and RPA Exhibit E, entitled "Environmental Exceptions," which provide:

> Any non-compliance or violation of Environmental Laws or Environmental Requirements in connection with Sellers [sic] Property discovered and documented in writing under the Brownfield Program with the State of North Carolina, for which Purchaser has or will been [sic] given complete immunity from environmental liability under the Brownfield Program; provided, however, any liability for clean up or remediation of Sellers [sic] Property as required under the Brownfield Program shall be the sole responsibility of Seller including, without limitation, all costs, fees and expenses associated with such clean-up or remediation.

(APA, Schedule 3.1.23; RPA Exhibit E.) Plaintiff replies that the exception does not apply because it was never given complete immunity and protection from liabilities associated with the environmental breaches. (Pl. Supp. Br. 11.) That assertion assumes, contrary to fact, that, having elected not to seek specific performance to close the transaction, Plaintiff has suffered liability to which such immunity or protection might attach. There is, however, no reason to assume that Plaintiff is liable for contamination when it has never become an owner or operator of the business or property. Had the transaction closed, Plaintiff would then either have been given indemnity or would have a cause of action to enforce such

indemnity. But it has not closed, and Heron Bay has not been harmed by liability it has not incurred.

{46} Plaintiff was, of course, well aware when entering the Purchase Agreements that the business had caused at least past contamination. As to any further indication of past or present contamination, there is no evidence that Defendants failed to keep Plaintiff fully informed as to the extent of contamination revealed by testing after the Purchase Agreements were executed. Defendants contracted for and funded the testing and investigations required by DENR in preparation for the final Brownfield Agreement. The very purpose of the testing was to document a baseline for contamination to the Property, to provide the contours of Heron Bay's prospective immunity. Taken to its logical conclusion, Plaintiff's contract interpretation would allow it to terminate the Purchase Agreements and then sue because the extent of the contamination led it to the determination to do so, and then to recover the full value of the business and property as if it had no greater contamination than known at the time the Purchase Agreements were entered. This would be at odds with the intent of the Exception to incentivize full disclosure and cooperation in the Brownfield testing, regardless of the results, and ensuring Plaintiff's indemnification for any additional liability after closing.

{47} It may be that ESC's testing could be interpreted to have documented contamination at the property line that might fall outside the indemnity provisions. (Pl. Supp. Br. 11–12.) This potential liability concern arises, however, as a result of closing. That condition subsequent never occurred.

{48} To recover damages on a breach of contract or warranty claim, the "plaintiff must show that the contract was breached by [a] defendant and that the breach caused [the] plaintiff's damages." *Biemann & Rowell Co. v. Donohoe Cos., Inc.*, 147 N.C. App. 239, 244, 556 S.E.2d 1, 5 (2001); *see also City of Charlotte v. Skidmore, Owings & Merrill*, 103 N.C. App. 667, 679, 407 S.E.2d 571, 579 (1991) ("In an action against an owner for breach of an implied warranty, as in any action for damages, proof of causation is essential."). Having elected not to pursue the

purchase, Plaintiff has offered no evidence that this potential misrepresentation caused it any damages.

{49}     In sum, Plaintiff has not presented evidence allowing its claim for breach of environmental warranties and representations to survive summary judgment.  Such representations were either excluded under Schedule 3.1.23 and Exhibit E or potential harm from their inaccuracy never materialized in any manner to expose Plaintiff to liability.

{50}     While the theory has not been cogently stated, it appears that Plaintiff intends to show damage from the environmental representations on the basis that had the contamination been less, the transaction would have closed, and Plaintiff is then entitled to recover its future lost profits.  (Pl. Supp. Br. Ex. 346 ¶ 25.)  That is, that Plaintiff is entitled to hypothecate the transaction it had expected and then to model a lost business value claim based on that hypothecated transaction.

{51}     Ultimately, it is possible that the surviving claims will require the court to grapple with whether Plaintiff's damages theory can overcome some readily apparent hurdles, such as the possible limitations imposed by the contract provisions and the long recognized doctrines growing out of the venerable decision in *Hadley v. Baxendale*, (1854) 156 Eng. Rep. 145, 9 Exch. 341.  Whether any such damage model may ultimately conform to the contract remedy provisions, the Purchase Agreements restrict Plaintiff to its contractually bargained-for remedies.[9]

{52}     Plaintiff also attempts to premise a claim on the broad assertion that Church "swept numerous serious environmental problems under the carpet over the years[.]"  (Pl. Supp. Br. 12.)  Plaintiff asserts that Church: (1) ignored ECS's recommendations that he report their 2007 findings to the State; (2) never informed DENR that he cancelled the Purchase Agreements; (3) ignored a 2010 letter from Guilford County Department of Public Health requesting that he enter into an Administrative Agreement to conduct a cleanup of his property, (Pl. Supp. Br. Ex.

---

[9] Specifically, in the event that a willful breach motivates a party to terminate the Purchase Agreements, APA Section 8.1(b) permits the non-breaching party to recover for injury resulting from such breach, not from the termination itself.

64,) and deferred action on a second letter, (Pl. Supp. Br. Ex. 276,) since the Brownfield Process had commenced, (Pl. Supp. Br. Ex. 278;) and (4) knowingly misrepresented on the Brownfield Application Owner Questionnaire that the Property had no contamination or prior spills, (Pl. Supp. Br. Ex. 277 ¶ 6(b–c).)[10]

{53}  For the same reasons stated above, Plaintiff has not demonstrated how it suffered harm or liability because of these misrepresentations or "rug-sweeping" maneuvers unless somehow it can tie these efforts to the breach-motivated termination claims allowed by the Purchase Agreements.  There is no basis to conclude that they stand alone as actionable misrepresentations.  Plaintiff received ECS's 2007 findings, (Pl. Reply Br. 6; Lowrie Dep. vol. I 101:10–102:9, Apr. 25, 2013 (testifying that Heron Bay and Lowrie were provided these reports in 2010),) Church did not fail to inform Heron Bay that the Purchase Agreements had been terminated, even if he neglected to inform DENR and Guilford County Department of Public Health, (Lowrie Dep. vol. II 397:1–8, 464:11–17, Apr. 26, 2013 (testifying that Defendants gave Heron Bay written notice that the Purchase Agreements were terminated);) and in signing the Brownfield Application Owner Questionnaire, Church made representations to DENR, not to Heron Bay.  Further, the record evidences that Defendants undertook efforts to find, rather than hide, contamination and reported ECS's findings to Heron Bay.  An ECS representative testified that UMF was always cooperative with ECS in testing the Property to uncover contaminants.  (Stewart Dep. 20:1–4, 60:14–61:4 (explaining that no one at UMF failed to cooperate with ECS and that Church authorized and paid for ECS to install an additional well to test the ground water).)

{54}  In conclusion, Plaintiff has shown no environmental misrepresentation on which it is entitled to proceed to trial.

---

[10] In support, Plaintiff also cited "Church vol. 2 p. 269".  (Pl. Supp. Br. 12.)  However, upon inspection of the second volume of Church's deposition, this page does not mention the Brownfield Application Owner Questionnaire.

## ii. Material Fact Issues Remain as to Whether Defendants Breached the APA by Failing to Report Customer Concerns

{55} Heron Bay contends that Defendants failed to inform it that one of UMF's existing customers expressed concern regarding the change in ownership. (Pl. Supp. Br. 11; Claude T. Church. Dep. 68:25–70:2, 70:15–71:12, Sept. 24, 2013.) Specifically, Plaintiff complains that Church did not tell Heron Bay that UMF's "biggest customer," Grass America, expressed serious concern about who was taking over the company and whether the new owner would carry on business like Church. (Claude T. Church Dep. 69:1–2; 69:5–6; 69:17–23, Sept. 24, 2013.) Heron Bay contends this was in violation of APA Section 3.1.25, which represented that neither Church nor UMF had reason to believe that any UMF suppliers or customers wished to terminate their contracts with UMF. (APA § 3.1.25.) Church knew that Grass America had concerns about the future of its business relationship with UMF, (Claude T. Church Dep. 69:1–2; 69:5–6, 69:17–23, Sept. 24, 2013,) and failed to report them to Heron Bay. This could constitute a breach of Section 3.1.25 if Grass America's concerns amounted to an expectation that it would terminate its contract with UMF.

{56} Church indicates that Grass America's concern motivated him to terminate the contracts with Heron Bay. (Claude T. Church Dep. 68:23–69:4; 69:17–70:14, Sept. 24, 2013.) APA Section 8.1(b) provides that "if such termination [under subsection (a)] shall result from . . . a willful breach by any party to this Agreement, such party shall be fully liable for any [damages] incurred or suffered by the other parties as a result of such failure or breach." Plaintiff has presented sufficient evidence to proceed with a claim that Defendants willfully failed to advise Heron Bay of customer concerns in violation of the APA, and that this willful failure caused Defendants to terminate the agreements and, consequently, Plaintiff's damages. However, Plaintiff will be limited to the damages that it can demonstrate were caused by that breach under acceptable damages theories.

### iii. Material Fact Issues Remain Regarding Whether Defendants' Allegedly Unauthorized Equipment Purchase Breached the APA

{57}    Plaintiff contends that UMF purchased new equipment and incurred additional indebtedness without Heron Bay's permission, in violation of various provisions of the Asset Purchase Agreement. (Pl. Reply Br. 3 (asserting violations of APA §§ 3.1.12, 3.1.19, 3.1.29, and 4.1.2).) Plaintiff does not offer specific record citations for its claim, and the court has not been able to discern from its own review of the record what facts support this allegation. Construing the claim liberally, the court gleans that in a November 7, 2011 letter to Defendants' attorney, Lowrie mentioned unauthorized equipment expenditures. (Pl. Resp. Br. Ex. 168.) In response, Stanaland acknowledged an equipment purchase, and apparently attached an updated disclosure.[11] (Pl. Resp. Br. Ex. 171.) Even construing this limited evidence the court was able to isolate in Plaintiff's favor, the court is dubious of whether Plaintiff can tie this purchase to Defendants' termination or to damage which Plaintiff suffered. However, simply because the record is not sufficiently clear to do otherwise, the court, with some reluctance, allows this claim to survive summary judgment.

### iv. Material Fact Issues Remain as to Whether Plaintiff Can Recover for Defendants' "No-Shop" Violations

{58}    Plaintiff also complains that UMF and Church violated the APA's "no-shop" term by repeatedly and aggressively pursuing discussions, negotiations, and offers to sell UMF with multiple parties on multiple occasions. The APA provides,

> neither [UMF] nor [Church] and none of their respective representatives will directly or indirectly solicit or engage in negotiations or discussions with, disclose any of the terms of this Agreement to, accept any offer from, furnish any information to, or otherwise cooperate, assist, or participate with, any person or organization (other than Purchaser and its representatives) regarding any offer or proposal with respect to the acquisition by purchase,

---

[11] If Stanaland attached the disclosure to the letter, Plaintiff did not include the attachment in its exhibits.

merger, lease or otherwise of [UMF], . . . and each will promptly notify Purchaser of any such discussion, offer or proposal.

(APA, § 4.1.7.) Defendants respond that any conversations with interested buyers were just "exploratory" and that UMF never provided financial information to these prospective buyers. (Defs. Opp'n Br. 15.) Defendants also assert that Church told each interested purchaser that he had entered into an agreement with another party. (Claude T. Church Dep. vol. II, 253:17–254:7, July 24, 2013.) Church testified that he was not aware that the Purchase Agreements required him to notify Heron Bay about any potential purchasers who contacted UMF, though he conceded that he had copies of the Purchase Agreements and could have looked at them. (Claude T. Church Dep. vol. II, 258:8–24, July 24, 2013; Claude T. Church Dep. 12:6–13, Sept. 24, 2013; APA § 4.1.7.)

{59}    The court views Church's claim that UMF withheld its financial data from prospective buyers with skepticism. Church's accountant, Davis, testified that he reviewed UMF's financial information with a prospective buyer at Church's direction while the Purchase Agreements were still in effect. (Davis Dep. 168:16–25, 256:4–11.) Church stated he did not instruct Davis to provide UMF's financial data in that instance. (Claude T. Church Dep. vol. III, 361:7–14, July 26, 2013.) Church admitted that he communicated with PMF to elicit an offer for UMF's purchase. (Claude T. Church Dep. vol. I, 142:18–23, Mar. 8, 2013.) The court concludes that Plaintiff has presented adequate evidence to support its claim that Defendants breached the no-shop provisions.

{60}    Defendants argue that, even if Plaintiff demonstrates a breach of the no-shop provisions, Plaintiff's remedy is limited to specific performance as set out in APA Section 4.1.9. (Br. Supp. Defs.' Mot. Summ. J. ("Defs. Supp. Br.") 17–18.) That section provides:

> in the event of a breach by [UMF] or [Church] . . . money damages would not be an adequate remedy to [Heron Bay] and, even if money damages were adequate, it would be impossible to ascertain or measure with any degree of accuracy the damages sustained by [Heron Bay] therefrom. Accordingly, if there should be a breach . . . of the provisions of this Article IV, [Heron Bay] shall be entitled to an

injunction restraining [UMF] and [Church] from any breach without showing or proving actual damage sustained by [Heron Bay]. *Nothing in the preceding sentence shall limit or otherwise affect any remedies that [Heron Bay] may otherwise have under applicable law.*

APA § 4.1.9 (emphasis added).

{61}   The court reads this provision to allow for specific performance, but does not provide that it is Plaintiff's sole remedy. The final sentence of the provision specifically reserves all other remedies to which Heron Bay would otherwise be entitled.

> v.   <u>Plaintiff Has Not Presented Evidence to Support an Actionable Claim that Defendants "Unduly Delayed" the Brownfield Process</u>

{62}   Plaintiff contends that Church terminated the Purchase Agreements on the pretext that the process was taking too long when, in reality, Church mistakenly believed he could complete the Brownfield Agreement on his own and find a new buyer once his right to terminate matured. (Pl. Supp. Br. 14.; Claude T. Church Dep. 74:2–10, Sept. 24, 2013.) As evidence of Church's delay in furtherance of this plan, Plaintiff asserts that Defendants failed to timely pay ECS's invoices, delaying submission of the Brownfield Assessment Report in violation of RPA Section 17.1. The record is clear that the delay in payment was, at most, six days. (Pl. Supp. Br. 6, Ex. 156; Stewart Dep. 77:23–78:21 (testifying that ECS had the report ready on October 25, 2011 but did not submit it until October 31, as it was awaiting payment from UMF); RPA § 17.1 (requiring "Seller's Cooperation" in effectuating the transaction contemplated).) The apparent argument is that the delay was deliberate in order to allow the termination right to mature a few days later.

{63}   Defendants respond that this late payment did not delay progress in obtaining a Brownfield Agreement because DENR did not review the report until November 9, 2011 at the earliest. (Def. Opp'n Br. 7; Eckard Dep. 116:7–117:13; Stewart Dep. 79:14–80:4, 84:25–85:10.) The record further indicates that the average timeframe for completing the Brownfield Process is eighteen (18) months.

(Eckard Dep. 30:5–10.) If this transaction had proceeded in accord with such an average, the Brownfield Agreement would not have been finalized until September 9, 2012, well past November 1, 2011 at which time the right to terminate matured.

{64} Even assuming a six-day delay in paying an invoice, the court cannot reasonably conclude that such a delay was material in light of the other undisputed evidence. The plain language of APA permits either Party to terminate the Purchase Agreements after November 1, 2011 if the sale had not yet been consummated. (APA § 8.1(a)(iv).) A final Brownfield Agreement, which would take, at the very least, twelve months to reach, was a prerequisite to consummating the deal. (Lowrie Dep. vol. III 502:24–503:11, May 15, 2013.) No claim based on any asserted late payment of ECS's invoice should proceed.

## B. Plaintiff Is Not Entitled to Proceed on a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

{65} Plaintiff contends that UMF and the Churches breached the covenant of good faith and fair dealing by interfering with the Brownfield process and by ultimately terminating the APA and the RPA in search of a more financially advantageous arrangement. (Am. Compl. ¶ 71–74.)

{66} "In every contract, there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985), *cited in Sunset Beach Dev., LLC v. AMEC, Inc.*, 196 N.C. App. 202, 217, 675 S.E.2d 46, 57 (2009). To support a claim, the breach of the implied covenant must be separate and distinct from any breach of other contract provisions. *Oakeson v. TBM Consulting Grp., Inc.*, 2009 NCBC LEXIS 34, at *13–14 (N.C. Super. Ct. Aug. 21, 2009); *see also Richardson v. Bank of Am., N.A.*, 182 N.C. App. 531, 558, 643 S.E.2d 410, 427 (2007). A breach of good faith and fair dealing claim "cannot be used to contradict the express terms of a contract[.]" *Rezapour v. Earthlog Equity Grp., Inc.*, No. 5:12CV105-RLV, 2013 U.S. Dist. LEXIS 92124, at *11 (W.D.N.C. July 1, 2013).

{67}    Here, Plaintiff complains that Defendants terminated the Purchase Agreements in hopes of finding a better deal.  (Am. Compl. ¶ 73.)  However, the APA specifically permits either party to terminate the deal for any reason.  (APA § 8.1.) It provides remedies if termination is for certain causes.   To allow Plaintiff to recover on this theory would contradict the express terms of the contract.   Plaintiff is not entitled to pursue an implied claim in derogation of the contract's own damages provision.  *Rezapour*, 2013 U.S. Dist. LEXIS 92124, at *11.

## C. <u>Any UDTPA Must Be Limited to the Extra-Contractual Claim Complaining of Defendants' Misappropriation of Marketing Materials</u>

{68}    In addition to reasserting its environmental representation and undue delay claims, which the court has rejected, as UDTPA claims, Plaintiff contends that Defendants committed unfair and deceptive trade practices in multiple ways. First, it states that Defendants attempted to hide modifications to the Property. (Pl. Supp. Br. 15–16.)  In support, Plaintiff references Church's in-house attempt to remediate the contamination in violation of APA Section 3.1.23. (Pl. Supp. Br. 16.) Second, Plaintiff complains that Defendants shopped the deal in violation of APA Section 4.1.7. (Pl. Supp. Br. 17–19.)  Third, Plaintiff contends that Church and UMF made unauthorized use of Heron Bay's brochure.  (Pl. Supp. Br. 19.)

{69}    Defendants urge that these are repackaged contract claims that cannot proceed as UDTPA claims.  (Defs. Opp'n Br. 23.)  To recover on an unfair and deceptive trade practices claim, a plaintiff must show that: "(1) defendant[] committed an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) plaintiff was injured as a result."  N.C. Gen. Stat. § 75-1.1 (2013); *Phelps-Dickson Builders, LLC v. Amerimann Partners*, 172 N.C. App. 427, 439, 617 S.E.2d 664, 671 (2005) (citing *Edwards v. West*, 128 N.C. App. 570, 574, 495 S.E.2d 920, 923 (1998)).  Absent evidence of aggravating circumstances, a breach of contract does not rise to the level of an unfair and deceptive trade practice, *Bumpers v. Community Bank of Northern Virginia*, ___ N.C. ___, 747 S.E.2d 220, 228 (N.C. 2013), even if the breach is intentional, *Nucor Corp. v. Prudential Equity Group,*

*LLC*, 189 N.C. App 731, 739, 659 S.E.2d 483, 488 (2008). Aggravating factors include "an intentional misrepresentation for the purpose of deceiving another and which has a natural tendency to injure the other." *Pan-Am Prods. & Holdings, LLC v. R.T.G. Furniture Corp.*, 825 F. Supp. 2d 664, 700 (M.D.N.C. 2011).

{70} The evidentiary record, even construed in Plaintiff's favor, does not support a finding of aggravating circumstances adequate to support Plaintiff's UDTPA claim based on the Purchase Agreement provisions. However, the claim regarding misappropriation of Plaintiff's marketing materials is extra-contractual and is not subject to the same limitations as contract claims. The court concludes that there is adequate evidence to allow this limited UDTPA misappropriation claim to survive summary judgment.

## VI. CONCLUSION

{71} For the foregoing reasons:

(1) Defendants' Motion is DENIED as to Plaintiff's claims under the Asset Purchase Agreement for unauthorized equipment purchases, failure to report customer concerns, and violations of the "no-shop" provision.

(2) Defendants' Motion is DENIED as to Plaintiff's UDTPA claim for misappropriation of marketing materials.

(3) Defendants' Motion is GRANTED as to all other of Plaintiff's claims, and those claims are DISMISSED.

(4) Plaintiff's Motion is DENIED.

IT IS SO ORDERED, this the 7th day of May, 2014.